No. 14865

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

GARY CISSEL,

          Plaintiff and Appellant,

    vs.

WESTERN PLUMBING & HEATING, INC.,
A Montana Corporation,

          Defendant and Respondent.

Appeal from:  District Court of the Sixth Judicial District,
            In and For the County of Park,
            Honorable Jack D. Shanstrom, Judge presiding.

Counsel of Record:

    For Appellant:

        Bennett and Bennett, Bozeman, Montana
        Lyman Bennett, III argued, Bozeman, Montana

    For Respondent:

        Keefer, Roybal and Hanson, Billings, Montana
        J. Dwaine Roybal argued, Billings, Montana

Submitted:  March 28, 1980

Decided:  JUN 4  1980

Filed:  JUN 4  1980

_Thomas J. Kearney_
                  Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Appellant Gary Cissel initiated this action by filing a complaint in the Sixth Judicial District, Park County, before the Honorable Jack D. Shanstrom. The complaint alleged the respondent, Western Plumbing and Heating, Inc. (herein Western), negligently installed a water closet valve in a home being constructed by him resulting in damage to the home which rendered it worthless. Western answered the complaint by asserting the damages complained of by Mr. Cissel were caused by negligence on his part.

The parties presented the case to a jury on the complaint and answer. The jury returned special interrogatories finding negligence on the part of both parties but finding only Mr. Cissel's negligence caused damages to the house. The jury returned a general verdict for defendant. The District Court entered judgment accordingly and this appeal followed.

Mr. Cissel and William Patenaude entered into a joint venture agreement to construct and sell a house in Livingston, Montana. Under the terms of the agreement Mr. Cissel was to provide the financing for the project and do the electrical work. Patenaude was to act as the general contractor. Construction of the house began in November 1976 and continued at a slow pace until March 1977. At that time Mr. Cissel terminated his agreement with Patenaude and hired John Sexton to complete construction of the home.

When Mr. Sexton began working on the house he discovered that one corner of the structure had settled approximately five-eighths of an inch. Sexton also ascertained that the house was moving in a side-to-side fashion. Sexton

installed a cement "deadman" below the foundation of the house to correct these problems. Sexton stated that no further slippage or settling occurred in the foundation for about the next eight months while he completed construction of the structure.

Mr. Cissel contracted with Western to do the plumbing in the house. As of February 4, 1978, all the plumbing had been completed except for the installation of a toilet in a bathroom on the first floor of the house. Western had installed the pipe that supplied water to the toilet and sealed it off with a water closet valve.

On February 4, 1978, Mr. Cissel conducted a routine inspection of the house. He found that the water closet valve installed on the toilet pipe had blown off and that water was flowing through the inside of the house. Mr. Cissel presented evidence at trial that the water flow from the pipe washed away a large portion of the fill dirt around the foundation of the house. He also presented testimony that the erosion of the fill dirt caused the house to settle approximately five inches which in turn caused cracks in the footings and foundation of the house, cracks in the stone veneer installed on the outside of the house, separation of the house's interior walls, buckling of sheet rock inside the house, and eventually the buckling of the floor in the house. These damages rendered the house unsaleable and worthless according to Mr. Cissel.

Western presented evidence along two lines to refute Cissel's theory that the leaking pipe caused the damage to the house. First, Western introduced testimony that both the fill and foundation systems used by Cissel in constructing the house were inadequate to support the structure.

Second, Western introduced evidence that water run-off from a snow melt, rather than water leaking from the toilet pipe, caused a substantial amount of the erosion of the fill dirt.

Mr. Cissel's attorney put William Patenaude on the stand at trial. On direct examination Mr. Patenuade testified as to the procedure followed in setting the foundation of the house and placing the fill dirt around the house. On cross-examination Patenaude was allowed to testify as to an incident that occurred after the filing of this lawsuit. He related an incident before trial in which Mr. Cissel allegedly grabbed him, threw him to the ground and threatened "to blow his brains out" if he did not testify favorably to Cissel's case at trial.

Mr. Cissel raises the following issues on appeal:

1. Was there substantial evidence before the jury to support the finding of no causal connection between Western's negligent installation of the water closet valve and the damages sustained by Mr. Cissel?

2. Did the District Court err in admitting the testimony of William Patenaude concerning the assault Mr. Cissel made on him and the threats Cissel made to him?

Mr. Cissel frames the first issue raised on appeal in terms of substantial evidence to support the jury verdict. The standard for review of an issue presented in this fashion is well settled. The Court will not disturb the jury's verdict if the record contains substantial evidence to support the verdict. Dodds v. Gibson Products Company (1979), ___ Mont. ____, 593 P.2d 1022, 1026, 36 St.Rep. 348, 353; McGuire v. American Honda Co. (1977), 173 Mont. 171, 177, 566 P.2d 1124, 1127; Big Sky Livestock, Inc. v. Herzog (1976), 171 Mont. 409, 414, 558 P.2d 1107, 1109-1110.

-4-

Further, the evidence must be viewed in the light most favorable to the prevailing party in the trial court on review. Herzog, 171 Mont. at 414, 558 P.2d at 1110.

Several witnesses presented testimony that there was no causal connection between Western's negligence and the damage to the house. The evidence indicated two causes of the settling of the house and resulting damages other than the leaking pipe. First, Western introduced evidence that improper design of the house and improper compaction of the fill dirt placed under the house caused the settling. Two expert witnesses testified to that effect. Kent Brewer, a structural engineer, testified that the foundation system of the house was inadequate; that the pylons that supported the front of the house were not set in bedrock; and that the fill under the house was improper. Brewer did state that water flow would accelerate settling in a loose fill situation, but that the settling would occur eventually even without the water flow. On cross-examination Brewer said the house would have settled in zero to five years without any water flow.

Walter Jones also testified. Jones is a civil engineer with a specialty in soil mechanics. He stated that the back of the house had been placed on bedrock and had not settled. He further observed that the front of the house had not been placed on bedrock and had settled. Jones explained that his company had taken soil samples and run tests to determine the compaction of the fill dirt under the house. Jones stated the tests showed the fill dirt was not compacted very well and that the house could be expected to settle about six inches under the existing fill conditions. Based on this data, Jones concluded the main reason for the settling

-5-

of the house was improper compaction of the fill dirt under the house. Jones further stated that he observed settling over the entire front of the house. He said the amount of the settling correlated to the depth of fill under a particular part of the house and that there was not an unusual difference in the settling where the erosion of the fill dirt had occurred.

In addition to the expert testimony, Mr. Cissel himself testified he was concerned with the amount of fill used in constructing the house. He stated he had the cement pillars installed in the front of the house to add support because of his concern. Mr. Cissel also stated he was generally concerned with the quality of the work Mr. Patenaude had done in the first phases of construction of the house, that the tamper used to compact the fill dirt placed under the house was a small one generally used for ditch or trench projects rather than a large fill area like the house project, and that no tests were done on the soil compaction during the construction of the house.

Bill Patenaude also testified concerning the fill conditions at the house. Patenaude did state that the fill dirt placed under the house was compacted with a tamper. He testified, however, that he had no expertise in preparing fill or constructing a foundation. Patenaude further said that no testing of the fill was done during the construction of the house and that he was concerned about the condition of the fill and the foundation. Patenaude stated his concern stemmed from the amount of fill used and the fact that the front of the house was placed on fill dirt while the back of the house was sitting on a rock ledge.

The second theory advanced by Western as a cause for the house's settling was erosion of the fill dirt due to run-off from snow melt. Myron DesChene testified concerning this theory. Mr. DesChene is an insurance man whom Cissel called to the house on the day he discovered the leaking pipe. DesChene testified the day Mr. Cissel called him to inspect the damage to the house was a very warm one for February as it was chinooking. He stated the snow from the top of the hill behind the house was melting. DesChene said water from the snow melt was running down the hillside behind the house, disappearing under the house, and that an amount of water about equal to the amount disappearing behind the house was coming out from under the house in the front corner of the house where the fill dirt eroded. Although DesChene recognized that he was not an expert in the area of water flow, he gave the following testimony on cross-examination:

> "Q. [Mr. Bennett] All right. I want to know if you know if the source of the water which caused the blow hole was from melting snow?
>
> "A. [Mr. DesChene] I can't say it wasn't.
>
> "Q. Can you say it was?
>
> "A. It certainly appeared to be. It had to come from someplace, and that is the only water that was laying around since when I arrived the water was turned off within the house and it was sitting in puddles."

Engineers Brewer and Jones also gave testimony supporting the theory that snow melt run-off caused the erosion of the fill dirt. Brewer testified that it was possible that the water from the leaking pipe went down a drain in the bathroom floor rather than down under the house. Both Brewer and Jones stated they observed more receding of the fill dirt between their first inspection of the site and the time of trial.

Faced with this type of evidence on causation, Mr. Cissel devotes a large part of his argument on this issue to pointing out evidence contradicting the above testimony and tending to show the leaking pipe caused the house to settle. This Court has rejected this kind of argument on substantial evidence questions on numerous occasions. For example, we have stated:

> "'It is well settled in this jurisdiction that wherever there is a conflict in the evidence this Court may only review the testimony for the purpose of determining whether there is any substantial evidence in the record to support the verdict . . . Where the evidence is conflicting, but substantial evidence appears in the record to support the judgment, the judgment will not be disturbed on appeal. . .'" McGuire, 173 Mont. at 177, 566 P.2d at 1127, quoting from Strong v. Williams, 154 Mont. 65, 68, 460 P.2d 90, 92.

Further, in Stamatis v. Industrial Indemnity Co. (1979), ___ Mont. ___, 601 P.2d 403, 36 St.Rep. 1866, we said:

> "Thus, where the findings are based on conflicting evidence, our function of review is confined to determining whether there is substantial evidence supporting such findings . . . Conversely, our function is not to determine whether there is sufficient evidence to support contrary findings." 601 P.2d at 406, 36 St.Rep. at 1869.

Thus it is clearly not the function of this Court to determine that there is evidence on the record that conflicts with a jury's verdict or that there is evidence on the record that supports a verdict other than the one reached by the jury. The Court must only determine if there is substantial evidence on the record to support the conclusion the jury ultimately reached.

Here it appears that evidence exists. The parties presented evidence postulating three possible causes for the damage to the house. Mr. Cissel's evidence tended to show the damage was caused by the leaking pipe. Western presented

-8-

evidence theorizing the damage occurred either because of improper construction of the house or erosion of the fill under the house caused by snow melt run-off. The jury found the evidence presented by Western more credible and found the theories advanced by Western represented the cause of the damage to the house. The finding is based on the above summarized testimony by Brewer, Jones, DesChene, Patenaude and even Cissel himself. The testimony of these witnesses represents substantial evidence on which the jury could base its verdict. Therefore, we will not overturn the verdict on appeal on the basis of the first issue raised by Mr. Cissel.

The second issue presented here involves the admission of testimony concerning the assault Mr. Cissel made on Bill Patenaude and the threats Cissel made to Patenaude. Mr. Cissel contends it was reversible error to admit this testimony. He offers two reasons for the exclusion of the evidence. Cissel first contends the evidence is irrelevant. Second, he argues that even if the evidence is relevant, the evidence should be excluded because its prejudicial effect substantially outweighs its probative value.

Both these arguments have been rejected in other jurisdictions. Addressing the relevancy issue, the court in Grain Dealers Mutual Insurance Company v. Farmers Union Cooperative Elevator and Shipping Association, Kirwin, Kansas (10th Cir. 1967), 377 F.2d 672, stated, "The fact that evidence on cross-examination is immaterial and irrelevant to the issue of negligence does not make it inadmissible if otherwise relevant and material on the credibility of the witness." 377 F.2d at 679. See also Stroud v. Door-Oliver, Inc. (1976), 112 Ariz. 574, 544 P.2d 1089, 1090. Concerning prejudice, it has been held that evidence

is admissible that shows a witness feared a defendant in a criminal case because of threats made to the witness by the defendant or an assault on the witness by the defendant despite the fact such evidence also shows the defendant may be guilty of another crime. Commonwealth v. Williams (1979), ___ Mass. ___, 393 N.E.2d 937, 942; Commonwealth v. Douglas (1968), 354 Mass. 212, 236 N.E.2d 865, 874.

The relevancy of the testimony appears to be equally well established under Montana law. Rule 611(b)(1), Mont.R.Evid., expressly allows a witness to be impeached on cross-examination. Allowable methods of impeachment include showing a motive to testify falsely. Clarke, Montana Rules of Evidence, 39 Mont. L. Rev. 79, 119 (1978). An appropriate area of inquiry to demonstrate a motive to testify falsely previously recognized by this Court is fear of prosecution for a crime on the part of a witness for the state in a criminal case. State v. Ponthier (1959), 136 Mont. 198, 208, 346 P.2d 974, 979-980. Thus, fear of the consequences of giving testimony is a legitimate subject for cross-examination to show a witness has a motive to falsify testimony. That is what Western attempted to do in this case. Mr. Cissel had threatened to kill Patenaude if he did not testify in a manner favorable to Cissel. Fear of Cissel carrying out that threat definitely could provide a motive for Patenaude to give false testimony at trial. The testimony was therefore relevant to show a motive to testify falsely and properly admitted by the District Court over Cissel's relevancy objection.

It should be noted that Mr. Cissel was entitled to an instruction limiting the scope of the jury's consideration of the evidence to the specific purpose for which it was

relevant. Rule 105, Mont.R.Evid. On his request, the court should have instructed the jury that the evidence of the assault and threat should only be considered as it pertained to Mr. Patenaude's credibility. However, a trial judge has no duty to give a limiting instruction absent a request at trial from the party wishing to limit the scope of the consideration of the testimony. Polster v. Griff's of America, Inc. (1974), 184 Colo. 418, 520 P.2d 745, 747; Rader v. Gibbons and Reed Company (1972), 261 Ore. 354, 494 P.2d 412, 416; Dagget v. Atchison, Topeka and Santa Fe Ry. Co. (1957), 48 Cal.2d 655, 313 P.2d 557, 564, 64 A.L.R.2d 1283. Mr. Cissel did not request a limiting instruction here. Therefore, we will not disturb the judgment of the lower court on the basis of the failure to give the limiting instruction.

Although properly admitted over the relevancy objection, the evidence of the assault and threats should not have been admitted if the prejudicial effect of the evidence substantially outweighed its probative value. Rule 403, Mont.R.Evid. It cannot be denied that the evidence prejudiced Mr. Cissel's case. On the other hand, the evidence was relevant to Mr. Patenaude's credibility. Patenaude testified as to the strength of the house's foundation and the condition of the fill dirt placed under the house. Both of these facts were crucial to the determination of the cause of the damage to the house. Thus, Mr. Patenaude's credibility was important and evidence concerning his credibility had significant probative value as to the crucial issue in the case.

This Court faced a similar situation in State v. London (1957), 131 Mont. 410, 310 P.2d 571. There we admitted testimony that a criminal defendant's wife had offered to

pay a witness $500 to testify favorably to the defendant at trial. Further, a heavy reliance must be placed on the District Court's discretion in determining if the prejudicial effect of evidence substantially outweighs its probative value. _Montana_ _Rules_ _of_ _Evidence_, supra, 39 Mont. L. Rev. at 101. It should also be noted the trial court allowed Mr. Cissel to present evidence in his rebuttal testimony explaining the circumstances under which he allegedly assaulted Mr. Patenaude and refuting some of the statements Patenaude made about the incident. This mitigated the prejudicial effect of the evidence.

Considering the probative value of the evidence, the fact that evidence has been admitted under similar circumstances in a prior Montana case, the heavy reliance placed on the discretion of the District Court in making this determination and the fact that Mr. Cissel had an opportunity to mitigate the prejudicial effect of the evidence, it cannot be said the prejudicial effect of the evidence substantially outweighed its probative value. The admission of the evidence does not, therefore, constitute ground for reversing the judgment of the District Court.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

I concur in the result reached by the majority but not in all that is stated.

-12-

_____
Justice