No. 92-445

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

LORI LUTZ, individually and as
personal representative of the
estate of GERALD LUTZ, deceased,

       Plaintiff, Respondent and
          Cross-Appellant,

-vs-

NATIONAL CRANE CORPORATION; a Delaware
corporation,

       Defendant, Appellant and
          Cross-Respondent.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
             In and for the County of Gallatin,
             The Honorable Larry W. Moran, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Carol M. Welch (argued); Hall & Evans,
          Denver, Colorado

          Robert F. James (argued); James, Gray &
          McCafferty, Great Falls, Montana

      For Respondent:

          Joe Bottomly (argued); Bottomly Law Offices,
          Kalispell, Montana

          Monte Beck (argued); Beck Law Offices,
          Bozeman, Montana

**FILED**

Filed: SEP 1 1994

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Argued:    October 27, 1993
Submitted:  March 16, 1994
Decided:    September 1, 1994

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal and cross-appeal from a jury verdict in a wrongful death/products liability lawsuit in the Eighteenth Judicial District Court, Gallatin County, Montana. The jury returned a verdict of $815,400 in favor of Gerald Lutz's estate. Lutz was killed by electrocution when the crane cable with which he was working contacted a power line. The jury apportioned 20 percent liability to Lutz and 80 percent liability to National Crane, the crane manufacturer. We affirm in part and remand in part.

Although National Crane raises eighteen issues on appeal, we consolidate and restate the issues as follows:

1. Did the District Court err by submitting the affirmative defense of misuse to the jury?

2. Did the District Court err by submitting the affirmative defense of assumption of risk to the jury?

3. Did the District Court err by allowing Lori's expert witnesses to testify?

4. Did the District Court incorrectly instruct the jury on strict liability and negligence?

5. Did the District Court err by allowing Lori Lutz to present rebuttal testimony?

6. Did the District Court err by excluding evidence relating to causation?

7. Did the District Court err by excluding evidence of OSHA and ANSI standards?

8. Did the District Court Judge err by not recusing himself or granting a mistrial based on a fee splitting arrangement with one of Lori Lutz's attorneys?

9. Did the District Court err by not granting a mistrial based on comments from the bench or on comments by Lori's counsel?

10. Did the District Court err in its evidentiary rulings relating to Lori Lutz's miscarriage and remarriage?

On April 28, 1989, Gerald Lutz (Lutz) was killed when the crane cable he was using contacted a 7,200 volt power line. Lutz, then 28, was a trained and licensed groundman with Montana Ready-Mix. At the time of the accident, Lutz and his supervisor, crane operator Jim Lees (Lees), were retrieving drilling pipe which spilled from a semi-trailer on Highway 191, outside of Bozeman.

Before lifting the pipes, Lees and Lutz discussed the task before them. They planned to extract several 40-foot pipes. Each pipe weighed between 300 and 400 pounds. Lees and Lutz were aware of overhead power lines in the area; that the crane cable with which they worked had no insulated link; and of the potential for electrocution. Lees and Lutz selected pipes that they believed could be safely removed. Because Lees did not feel they could safely remove some of the pipes which were located beneath the power lines, they placed a two-by-four board on the ground to delineate between the safe and unsafe "pick" areas. They then called in a wrecker to drag the pipe that they believed could not be safely removed.

Lutz's job entailed hooking metal chains, which were attached

3

to the uninsulated crane cable, around the ends of the pipe and guiding the pipes to a waiting semi-trailer. Lees operated the crane.

Evidently, on the fatal pick--as the slack in the cable was eliminated--the taut cable, apparently no longer directly beneath the tip of the crane's boom, contacted the power line. The cable conducted electricity from the power line to the pipe, electrocuting Lutz.

On behalf of Lutz's estate, Lutz's widow, Lori Lutz (Lori), filed suit against National Crane, M & W Repair and Americo Trucking on March 9, 1990. M & W Repair and Americo Trucking elected to settle with Lori, leaving National Crane as the sole defendant in this action. Lori proceeded against National Crane on the theory of strict liability in tort, alleging that the crane-- absent an insulated link--was defectively designed and unreasonably dangerous. National Crane raised the statutory affirmative defenses of assumption of risk and misuse.

The jury returned a $815,400 verdict in favor of Lori. That amount, however, was reduced by 20 percent, the percentage of responsibility allocated to Lutz. The $110,000 paid in settlement by other defendants was also deducted. Judgment was entered for $542,320, plus allowable costs. National Crane appealed from the verdict and judgment. Lori cross-appealed on the issues of assumption of risk and misuse, seeking to recover the jury's full determination of damages.

4

## I -- The Misuse Defense

Did the District Court err by submitting the affirmative defense of misuse to the jury?

In 1987, the Montana Legislature enacted § 27-1-719, MCA, which established misuse as an affirmative defense in products liability cases. The statute provides that the defense may be asserted if "[t]he product was unreasonably misused by the user or consumer and such misuse caused or contributed to the injury." Section 27-1-719(5)(b), MCA.

According to National Crane, two types of product misuse exist: 1) use for an improper purpose, such as using a glass bottle for a hammer; or 2) use in an improper manner, such as using a forklift on steep, rather than level, terrain. See Kavanaugh v. Kavanaugh (Ariz. 1982), 641 P.2d 258, 262-63; Simpson v. Standard Container Co. (Md. Ct. Spec. App. 1987), 527 A.2d 1337, 1341; see also Harper, James, Jr., and Gray (2d Ed. 1986), The Law of Torts § 26.8 at 364-69.

National Crane argues that Lutz used the crane in an improper manner by sideloading, or dragging the load, from beneath the power lines. The 13-foot, 9-inch distance between the tip of the boom and the power line, National Crane asserts, provides uncontroverted proof that Lutz was sideloading. If the load had been directly beneath the boom's tip when the pick began and the cable became taut, then the cable would not have contacted the power line. Comparing the relative positions of the boom tip and the power line with the fact that the cable contacted the power line, National

5

Crane argues, leads to one conclusion: Lutz's misuse of the crane (sideloading) was the sole cause of the accident.

The District Court prevented National Crane from introducing certain evidence in support of its misuse defense. For instance, the court restricted opinion testimony by Tom Jones, a Montana Department of Labor employee. National Crane attempted to elicit opinion testimony from Jones--who was not disclosed as an expert-- as to misuse, or sideloading, of the crane. Accordingly, the court limited Jones' testimony to include only matters within his personal knowledge.

The admission of evidence rests within the sound discretion of the district court and will not be overturned absent an abuse of discretion. State v. Mayes (1992), 251 Mont. 358, 373, 825 P.2d 1196, 1205. The District Court's rulings on evidence offered in support of the defense of misuse were correct; the court did not abuse its discretion.

According to National Crane, "a manufacturer is not responsible for injuries resulting from abnormal or unintended use of his product if such use was not reasonably foreseeable." Trust Corp. of Mont. v. Piper Aircraft Corp. (D. Mont. 1981), 506 F. Supp. 1093, 1097 (citing 1 Frumer and Friedman, Products Liability, § 15:01). Moreover, National Crane contends, foreseeability includes only what is objectively reasonable to expect, not everything that could conceivably occur. Winnett v. Winnett (Ill. 1974), 310 N.E.2d 1, 5-6. National Crane suggests that sideloading a crane is an abnormal, rather than foreseeable, misuse.

6

Lori argues that Lutz's conduct did not amount to unreasonable, unforeseeable misuse. Rather, according to Lori, the evidence indicates that the crane was being used for its intended purpose: to lift large, heavy drilling pipes and place them on a flat-bed trailer. Lori contends that no evidence exists--either admitted or excluded--that the crane was <u>intentionally</u> misused by sideloading. To the contrary, Lori argues that Lees and Lutz knew the power lines were "live" and potentially dangerous. Lori further contends the evidence establishes that Lutz and Lees took careful steps to avoid sideloading: Lees situated the crane alongside the road, perpendicular to the power lines, and positioned the crane's boom so that the cable would fall 12 feet short of the power lines; Lees and Lutz selected the pipes which they thought could safely be removed without chancing contact with the power lines; they delineated safe from unsafe pick areas with a two-by-four board; they called in a wrecker to drag pipes which they believed could not safely be removed; and Lutz only hooked up those pipes which he and Lees had selected for removal.

At most, Lori argues, the evidence shows ordinary negligence through misperception. The record indicates that Lees or Lutz inadvertently misperceived the distance between the crane cable and the power line. The difficulty of judging the distance to power lines was borne out in eye-witness accounts, scientific articles on visual perception, and expert testimony. Visual misperception of power lines, Lori asserts, may not rise even to the level of contributory negligence, let alone misuse. <u>See</u> Burke v. Illinois

7

Power Co. (Ill. App. 1978), 373 N.E.2d 1354, 1364.

Lori contends that while <u>unreasonable misuse</u> is a recognized defense in Montana under § 27-1-719(5)(b), MCA, reasonably foreseeable misuse is not recognized as a defense. <u>See</u> Kuiper v. Goodyear Tire & Rubber Co. (1983), 207 Mont. 37, 63, 673 P.2d 1208, 1222; <u>Trust Corp. of Mont.</u>, 506 F.Supp. at 1097.

According to Lori, an insulated link, which is readily available, should have been incorporated into the crane's design. These links are the seat belt or air bag of the crane industry. Lori contends that because more than 2,000 people are maimed or injured by crane/power line electrocutions every year, the danger has long been known, and should be eminently foreseeable to the manufacturer. In light of that eminent foreseeability, Lori urges this Court to determine, as a matter of law, that the affirmative defense of misuse should never have been submitted to the jury.

In deciding whether the defense of misuse should have been submitted to the jury, we turn to our recent decision in Hart-Albin Company v. McLees (Mont. 1994), 870 P.2d 51, 51 St.Rep. 112. In <u>Hart-Albin</u>, when ruling on the term "unreasonably misused" as set forth in § 27-1-719(5)(b), MCA, this Court stated:

> [A] manufacturer is not responsible for injuries resulting from abnormal or unintended use of a product if such use was not reasonably foreseeable. Generally, the defense of misuse refers to a use not foreseen by the manufacturer of the product. "Most cases have indicated that the key issue involved in a determination whether a product has been misused is foreseeability." The definition of misuse, then, incorporates the concept of abnormal or unintended use, but emphasizes unforeseeability. The defense of misuse is not available if the misuse of the product was reasonably foreseeable.

8

870 P.2d at 53-54 (citations omitted).

In Hart-Albin, respondent Leviton manufactured an electrical extension cord connector which overheated and started a fire that caused extensive damage to a Hart-Albin department store in Billings. Among other things, the jury found that Hart-Albin misused the cord connector and that the misuse was a proximate cause of the damages.

In responding to a written interrogatory concerning misassembly or foreseeable misuse of the cord connector, Leviton agreed that the connector could "be abused or misassembled." During trial, a Leviton representative stated that he was aware that it was possible to misassemble the cord connector. In reversing on the misuse issue, this Court concluded that "Leviton admitted it was foreseeable that the Catalog No. 67 cord connector could be misused through misassembly." Hart-Albin, 870 P.2d at 54.

In applying the misuse defense of § 27-1-719(5)(b), MCA, to the facts of this case it is necessary to understand what the phrase "unreasonable misuse" means in the context of the statute. In using the term "unreasonable misuse," the plain language of the statute requires that if a misuse is "reasonable," then the defense is not available. Our statute clearly contemplates that manufacturers must expect, or, stated another way, must reasonably foresee, that their products will not always be used in precisely the manner for which they were designed or constructed--hence, the Legislature's use of the phrase "unreasonable misuse."

In the instant case, there is really no factual disagreement

9

that cranes are often operated in close proximity to live electrical lines and that, as the evidence here indicates, sideloading is a not an uncommon, albeit improper, practice of crane operators and groundcrews. Were that not the case, insulated links would not be as readily available and as commonly used as they are and there would not be the high number of deaths and injuries from crane/power line contacts that there are.

Clearly, if, as here, the manufacturer expects or, stated another way, reasonably foresees, that its product is or will be subject to misuse in a certain fashion, then the fact that the user of the product actually does use--or, in the words of the statute, misuse--the product in that fashion can hardly be said to be "unreasonable." In short, reasonably foreseeable misuse is reasonable misuse. Furthermore, if the manufacturer reasonably foresees that its product can be misused in a certain fashion-- i.e., that the offending misuse is "reasonable"--then the manufacturer does not have the benefit of a defense which exonerates or mitigates its breach of duty and its wrongful conduct in failing to design out or guard against the defect. To hold otherwise simply shifts the consequences of the manufacturer's breach of duty to the innocent, or perhaps, even negligent, user and, in violation of the statute, injects contributory negligence into the law of strict liability.

While "reasonableness" is generally a question of fact to be determined by the jury, see Dean v. Austin Mutual Ins. Co. (Mont. 1994), 869 P.2d 256, 258, 51 St.Rep. 102, 103, where, as in Hart-

10

Albin and here, the party asserting the unreasonable misuse defense acknowledges the foreseeability of the misuse, then, as a matter of law, it is improper for the district court to submit that issue for determination to the trier of fact.

National Crane admits that the cranes which it manufactures can be misused through sideloading. National Crane also knows that if sideloading occurs in the vicinity of power lines, the possibility exists that its crane cables might contact power lines. It is undisputed that a crane/power line contact was foreseeable to National Crane. In fact, the record establishes that there are 2,300 crane/power line contacts in the United States each year and crane/power line electrocutions are the fifth leading cause of work-related deaths in the United States.

It being admitted that the alleged misuse of the crane through sideloading was reasonably foreseeable to National Crane, we hold that, as a matter of law, the affirmative defense of unreasonable misuse is unavailable to National Crane. Therefore, we need not review whether the District Court correctly instructed the jury on misuse.

### II -- The Assumption of Risk Defense

Did the District Court err in submitting the affirmative defense of assumption of risk to the jury?

Assumption of risk, like misuse, is a statutory affirmative defense in Montana. Section 27-1-719(5), MCA. The statute provides that the defense may be asserted if:

> [t]he user or consumer of the product discovered the
> defect or the defect was open and obvious and the user or

11

consumer unreasonably made use of the product and was injured by it.

Section 27-1-719(5)(a), MCA. Moreover, assumption of risk "must be applied in accordance with the principles of comparative negligence set forth in 27-1-702." Section 27-1-719(6), MCA; Zahrte v. Sturm, Ruger & Co., Inc. (1983), 203 Mont. 90, 94, 661 P.2d 17, 18-19.

In Krueger v. General Motors Corp. (1989), 240 Mont. 266, 783 P.2d 1340, the plaintiff brought a products liability action against G.M. for a defectively designed four-wheel drive transfer case. The plaintiff had disconnected the front drive shaft and the vehicle rolled backwards, severely injuring the plaintiff. This Court approved the district court's jury instruction on assumption of risk. The instruction required that G.M. had to prove the plaintiff: 1) actually knew before he was injured that the vehicle would roll if he disconnected the drive line; 2) knowing this, voluntarily exposed himself to that danger; and 3) unreasonably exposed himself to that danger.

Assumption of risk is analyzed under a subjective standard rather than under the objective "reasonable person" standard. Krueger, 783 P.2d at 1347. The standard by which we evaluate assumption of risk is:

> what the particular plaintiff sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence. . . . If by reason of age, or lack of information, experience, intelligence, or judgment, the plaintiff does not understand the risk involved in a known situation, he will not be taken to assume the risk, although it may be found that his conduct is contributory [comparative] negligence because it does not conform to the community standard of the reasonable man.

12

Krueger, 783 P.2d at 1347 (citations omitted).

By this definition, it is incumbent upon National Crane to prove that Lutz actually knew that when the pick was commenced that the crane cable would come in contact with the live electrical line; that he knew if that happened he would suffer serious injury or death; and that, knowing that, he voluntarily exposed himself to that danger. Krueger, 783 P.2d at 1347.

National Crane argues that proving "unreasonable use" required it to present evidence of what Lutz saw, knew, understood and appreciated. For example, National Crane attempted to introduce evidence of Lutz's training, such as his responses and understanding during the licensure procedure; his knowledge and understanding of the warning decals on the crane; instructions he received concerning crane safety as a result of his employment; his knowledge of the information contained in the crane manual; his knowledge garnered from instructional videotapes; and testimony about the conversations in which Lutz participated at the accident scene prior to his death.

National Crane presented evidence in an effort to bolster its assumption of risk defense, some of which was restricted by the District Court. For example, the court limited cross-examination of one of Lori's experts regarding warnings/labels on cranes. It also partially restricted the testimony of three of National Crane's witnesses.

We determine that the District Court's evidentiary rulings were entirely justified. A close examination of the record

13

demonstrates that National Crane consistently attempted throughout the trial to introduce evidence of ordinary negligence. The court, in turn, correctly restricted National Crane's efforts to interject negligence concepts into this design defect case.

Under § 27-1-719(5)(a), MCA, which was not in effect when Krueger was handed down, the assumption of risk defense is available in a strict liability case if: "[t]he user or consumer of the product discovered the defect or the defect was open and obvious and the user or consumer unreasonably made use of the product and was injured by it." (Emphasis added.)

Here, accepting National Crane's arguments that Lutz was aware that the crane was not insulated against contact with power lines and that he understood the danger of a crane/power line contact, such facts establish only the first part of the defense--that the consumer discovered the defect or the defect was open and obvious. There remains the second portion of the defense--that Lutz unreasonably made use of the product. Keeping in mind that, as we have stated previously, the use of sideloading, albeit improper, is reasonably foreseeable and, is, therefore, not unreasonable, even assuming sideloading and knowledge of the uninsulated crane and the danger, under the statute Lutz did not unreasonably make use of the product, unless, of course, he knew in advance that the crane cable would come in contact with the power line.

Lori argues that National Crane presented no evidence that Lutz knew or appreciated that the crane cable would touch the power line when the pipe was about to be lifted. At most, Lori contends,

14

Lutz may have been guilty of contributory negligence in failing to correctly judge the distance between the power line and the crane cable--an understandable misperception, given the abundance of scientific and on-site evidence presented concerning the difficulties associated with depth perception.

Lori argues that in order to prove assumption of risk, National Crane must prove that Lutz continued to hold onto the metal pipe knowing the cable would contact the power line and result in certain electrocution. In essence, Lori suggests National Crane must prove that Lutz had a death wish.

Since, as National Crane admitted, sideloading was a foreseeable, and, hence, reasonable, though improper, use of the crane, the second part of the defense of assumption of risk could not, as a matter of law, be proven under the statute, and it was error to submit that defense to the jury under such circumstances.

Allowing assumption of risk to be submitted to the jury under these facts would not only enlarge the concept of contributory negligence to consume the separate defense of assumption of risk in products liability cases, but would also undermine this Court's efforts to ensure that what remains at issue in products liability cases is not the conduct of the "reasonable person," but the condition of the product. See Kelly v. General Motors Corp. (D. Mont. 1980), 487 F.Supp. 1041, 1044; Kuiper, 673 P.2d at 1222.

National Crane insists that if the jury had heard evidence concerning Lutz's specialized knowledge and training, then it would have concluded that Lutz "unreasonably made use of" the crane by

15

sideloading. Section 27-1-719(5)(b), MCA (emphasis added). We disagree.

As discussed above, use of a crane by sideloading is reasonably foreseeable to a manufacturer. As such, it cannot be considered an unreasonable use. Even assuming that sideloading occurred in this case and that Lutz knew the crane cable was uninsulated, Lutz did not unreasonably use the crane unless he knew in advance that the crane cable would contact the power line. Because Lutz did not know that the crane cable would contact the power line, he could not have assumed the risk for his own death. Therefore, under these facts, the District Court erred by submitting the affirmative defense of assumption of risk to the jury.

In concluding that the assumption of risk defense was not available to National Crane, we need not address whether the District Court correctly instructed the jury on assumption of risk or whether it erred by combining the assumption of risk and misuse defenses on the jury verdict form.

III

Did the District Court err by allowing Lori's expert witnesses to testify?

National Crane levels serious allegations of discovery abuses against Lori. Most notably, National Crane contends that Lori did not respond to interrogatories in accordance with the discovery schedule and pretrial order, and in accordance with Rule 26(b), M.R.Civ.P.

16

Without belaboring the record with regard to discovery, we note that neither party was altogether cooperative. It is apparent that the parties jockeyed for position throughout discovery. The court granted extensions for disclosure deadlines, held a hearing on discovery issues, ordered simultaneous disclosure, and--to limit litigation costs--restricted both parties from deposing experts.

While Lori claims to have provided adequate notice of experts eight and one-half months before trial, National Crane berates Lori's disclosure of experts. Having compared the disclosures by both parties, this Court is satisfied that Lori's disclosures were adequate. As the District Court Judge stated during a November 8, 1992, hearing:

> Now, I've gone through all the briefs. I've gone through the interrogatories. I've gone through the disclosures, and quite frankly, I feel the disclosures that were made are entirely adequate under the circumstances to give full and complete warning to each side as to what the experts are going to testify about at trial.

The District Court Judge was in the best position to determine good faith discovery efforts. See Owen v. F.A. Buttrey (1981), 192 Mont. 274, 627 P.2d 1233. The court did not abuse its discretion; therefore, we will not disturb its determinations relating to disclosure of experts and discovery in general. See J.L. v. Kienenberger (1993), 257 Mont. 113, 119, 848 P.2d 472, 476 (citations omitted).

IV

Did the District Court incorrectly instruct the jury on strict liability and negligence?

National Crane contends that the District Court acted

17

improperly when it advised the jury that National Crane could not escape liability by proving that Lutz failed to act reasonably or prudently. Therefore, National Crane objected to Instruction 19, which stated:

> You are instructed that in a strict liability case such as this, negligence on the part of the decedent, if any, and negligence on the part of an employer, employee or other third persons, if any, is not a defense. In other words, the defendant cannot escape responsibility for the death of Gerald Lutz by alleging that the decedent or some other person or persons failed to act reasonably or prudently.

According to National Crane, Instruction 19 contradicts Instructions 16 and 17, which provided that National Crane had to prove that Lutz unreasonably exposed himself to danger and unreasonably misused the crane. It is obvious that in Instructions 16 and 17, the word "unreasonable" was used in the context of the defenses of misuse and assumption of risk.

As Lori correctly asserts, Instruction 19 correctly sets forth the law. The negligence of Lutz, his fellow employees or others is not a defense to a strict liability claim. We conclude that contributory negligence, except as provided for in § 27-1-719, MCA, is not a defense in a strict liability action. The District Court correctly instructed the jury on strict liability and negligence.

V

Did the District Court err by allowing Lori Lutz to present rebuttal testimony?

When presenting her case, Lori's experts testified that insulated links were sold in commerce, that none had failed, and that they were electronically and economically feasible. During

18

its case-in-chief, one of National Crane's experts, Professor Ralph Barnett, challenged the integrity of insulated links available on the market. Lori correctly contends that National Crane's disclosures did not indicate that its expert would testify as to mechanical problems associated with the use of insulated links. Therefore, the court allowed Lori to present rebuttal testimony regarding the strength and mechanical feasibility of insulated links.

The District Court also allowed rebuttal testimony by Charles Cashell, one of Lori's experts, concerning wage rates and work schedules in the Bozeman area. Mr. Cashell rebutted testimony by two of National Crane's witnesses, who provided opinion testimony on areas which were not disclosed to Lori during discovery.

The law does not require advance disclosure of rebuttal witnesses. Massman v. City of Helena (1989), 237 Mont. 234, 773 P.2d 1206. In both instances, we hold that the District Court did not abuse its discretion by allowing rebuttal testimony. See Valley Properties Ltd. Partnership v. Steadman's Hardware, Inc. (1992), 251 Mont. 242, 824 P.2d 250.

VI

Did the District Court err by excluding evidence relating to causation?

Lori's experts testified that two types of insulated links are available in the United States. The two types have differing weight capacities, voltage ratings and attachment methods, which require selection of the link and attachment most appropriate for

19

the crane's usage; and that the crane cables, or riggings, can vary--depending on crane usage. Lori's experts acknowledged that because of the risk of damage to a link, it is not preferable for a link to be left attached to the cable at all times.

National Crane, in turn, asserted that providing a link at the time of the sale would not have guaranteed its use or proper use at the time of the accident. According to National Crane, Greg Poncelet, Lutz's employer, was prepared to testify as to seven reasons why he would not use insulated links. Notably, Poncelet admitted that he "came up" with these reasons on the morning of trial. National Crane argues that the District Court erred by restricting evidence which was relevant to causation when it would not allow Poncelet to testify concerning the seven reasons why he would not use insulated links.

National Crane argues that to recover under a products liability claim in Montana, Lori must prove that the injury occurred because the product was defective, unreasonably unsafe and that "the [design] defect existed when the product left the hands of the particular defendant." See Barich v. Ottenstror (1976), 170 Mont. 38, 42, 550 P.2d 395, 398 (citation omitted).

We are not convinced by National Crane's argument. Rather, this was another attempt by National Crane to interject negligence concepts into a strict liability setting. Allowing Poncelet to testify as to why he would not have used the insulated links would only have provided evidence of employer negligence. We reiterate that in products liability actions, our analysis focuses on the

20

condition of the product--not the conduct of the employer.  Section 27-1-719(6), MCA; Brown v. North Am. Mfg. Co. (1978), 176 Mont. 98, 113, 576 P.2d 711, 720-21.

National Crane's offer of proof, from an employer who was facing a workers' compensation claim, is best characterized as "pure self-serving speculation."  A manufacturer has no right to assume that safety devices, such as an insulated link, will not be used by an employer and thus defend on that basis.  Bexiga v. Havir Mfg. Corp. (N.J. 1972), 290 A.2d 281, 286.  The District Court did not err by restricting Poncelet's testimony.

VII

Did the District Court err by precluding evidence of OSHA and ANSI standards?

During voir dire, the court, upon Lori's counsel's objection, prohibited questions by National Crane concerning jurors' knowledge of the Occupational Safety and Health Act (OSHA) and American National Standard Institute (ANSI) standards.  The District Court later granted Lori's motion in limine to exclude any reference to or testimony about OSHA or ANSI.

National Crane contends that OSHA and ANSI regulations are admissible as bearing on the existence of a defect.  While National Crane could find no Montana case law dealing with this issue in a products liability context, it did find one jurisdiction in which liability for unreasonably dangerous design defects is tested against general negligence principles.  Bolm v. Triumph Corp. (N.Y. 1973), 305 N.E.2d 769.  According to National Crane, many courts

21

have concluded that OSHA and ANSI standards are admissible as some evidence of the existence or nonexistence of a defect. See, e.g., Price v. Buckingham Mfg. Co. (N.J. App. 1970), 266 A.2d 140, 141.

We note that neither OSHA nor ANSI regulations require that cranes be equipped with insulated links. In addition, these regulations mandate observance of all other safety precautions when operating a crane in the vicinity of power lines. For example, the regulations suggest: a 10-foot buffer between cranes and power lines; de-energizing power lines, if possible; and the use of tag lines.

National Crane argues that having obtained an order directing its attorneys to avoid the topics of OSHA and ANSI, Lori's counsel then questioned two of her experts on those topics. Believing that Lori's attorneys had "opened the door" on OSHA and ANSI, National Crane asked the court to reconsider its prior ruling and permit National Crane to show that neither OSHA nor ANSI required links. The motion was denied.

As Lori correctly asserts, her experts did not testify regarding any substantive aspects of OSHA or ANSI. Rather, the "10-foot rule" was acknowledged by both parties independent of OSHA--and the record shows that National Crane presented considerable evidence in that regard. Lori argues that OSHA and ANSI regulations are inadmissible for three reasons. First, the standards do not take a relevant position on insulated links; they merely indicate that an employer may use insulated links. Second, the fact that OSHA does not specifically require an employer to use

22

insulated links is not relevant to the issues involved in a products liability design case against a manufacturer. And third, the evidence would mislead the jury and be unduly prejudicial to the plaintiff.

The fact that OSHA and ANSI speak to permissive use of insulated links is not relevant to issues articulated by this Court as dispositive in design defect cases. Rather, our analyses have focused on the feasibility and practicality of the design, as well as marketability. Rix v. General Motors Corp. (1986), 222 Mont. 318, 328, 723 P.2d 195, 201; Krueger, 783 P.2d at 1345.

Allowing OSHA and ANSI regulations to be presented might have misled the jury. For example, they might have led the jury to infer or conclude that Lutz's employer--rather than the manufacturer--had the responsibility to provide the safety device. See Murphy v. L & J Press Corp. (8th Cir. 1977), 558 F.2d 407, 409-10.

While most courts allow government regulations to be used against manufacturers in negligence cases, the same is not true where the issue is strict liability. We hold that the District Court was correct in excluding evidence of OSHA and ANSI standards. Even if OSHA and ANSI regulations have some tenuous relevancy in products liability cases such as this, it is not reversible error to exclude them. See McKinnon v. Skil Corp. (1st Cir. 1981), 638 F.2d 270.

## VIII

Did the District Court Judge err by not recusing himself or

granting a mistrial based on a fee splitting arrangement with one of Lori Lutz's attorneys?

Immediately after the jury began deliberations, National Crane asked the court about a rumor it heard on the last day of testimony--that the District Court Judge and Lori's counsel, Monte Beck, were sharing attorney's fees.

Before becoming a Judge in the Eighteenth Judicial District Court, the District Court Judge shared office space with Mr. Beck. When the Judge assumed the bench, he referred his cases to several Bozeman attorneys, one of whom was Mr. Beck. The Judge referred a case involving Lawrence A. Chapel to Mr. Beck. Mr. Beck represented Chapel, who was the plaintiff in a case subsequently decided by this Court--Chapel v. Allison (1990), 241 Mont. 83, 785 P.2d 204. That case, which was reversed and remanded by this Court, was retried in the Sixth Judicial District and a verdict in favor Chapel was on appeal to this Court when National Crane raised this issue. Had Chapel's $315,000 verdict been upheld on appeal, then Mr. Beck and the District Court Judge, by Mr. Beck's admission, would have split the attorney's fees, perhaps in excess of $104,000. The parties in Chapel have since stipulated to dismiss the appeal.

National Crane characterizes the financial arrangement between the Judge and Mr. Beck as that of debtor/creditor, and asserts that the appearance of impropriety in this case mandated recusal or the grant of a mistrial. Canon 2(A) of the Code of Judicial Conduct provides that "[a] judge shall avoid impropriety and the appearance

24

of impropriety in all of the judge's activities."

While this Court is mindful of the appearance of impropriety, no "aura of possible bias and prejudice" existed in this case. Washington v. Montana Mining Properties, Inc. (1990), 243 Mont. 509, 516, 795 P.2d 460, 464. First, National Crane cites little authority in support of its argument. Second, National Crane neither argues nor establishes actual prejudice. Third, there was no statutory violation by either Mr. Beck or the District Court Judge. See § 3-1-803, MCA. And fourth, Mr. Beck and the District Court Judge were not in a debtor/creditor relationship. Rather, they were creditors of the same person.

National Crane has failed to demonstrate that the District Court Judge had any interest in the outcome of this case. Moreover, neither Mr. Beck nor the District Court Judge engaged in any wrongdoing. The District Court Judge did not abuse his discretion by not recusing himself or by not granting National Crane's motion for a mistrial.

IX

Did the District Court err by not granting a mistrial based on comments from the bench or on comments by Lori's counsel?

During trial, the District Court Judge and counsel for both parties engaged in an off-the-record discussion at the bench. The District Court Judge was attempting to discern the point that Lori's counsel was trying to make in his questioning. According to National Crane, during that exchange the Judge made a comment to the effect that National Crane "did nothing to try to make a better

product; they didn't even keep statistics."

National Crane contends that the jury may have heard these statements and may have misinterpreted the discussion. However, National Crane did not ask the court to admonish the jury or question it to determine if anyone overheard the conversation. Therefore, we hold that National Crane failed to preserve its right to appeal this issue. See Gee v. Egbert (1984), 209 Mont. 1, 19, 679 P.2d 1194, 1203-04.

National Crane also argues that Lori's counsel delivered a "send a message" argument during closing which inflamed the jury. National Crane, anticipating this type of argument, made an oral motion in limine to prevent statements which might "inject the notion of punitive damages in the case, although such damages had not been sought." The court denied the motion, noting that the record was preserved and that National Crane "needn't object to this type of argument during closing." Specifically, Lori's attorney stated that National Crane would not

> do anything [to fix the problem] until you tell them to do something. Hit them in the pocketbook where it makes a difference a few times and it will change.

According to Lori, this argument was appropriate in the context of this case. She contests National Crane's position that it has done no wrong and continues to do no wrong despite repeated notice. Montana case law supports Lori's contention:

> Where B.N. took the position that it had done no wrong under the law, and would continue those practices, Kalanick rightfully took issue with B.N.'s contentions.

Kalanick v. Burlington Northern Railroad Co. (1990), 242 Mont. 45,

26

54, 788 P.2d 901, 907. In Krueger, this Court declined to determine whether the "send a message" argument was proper or prejudicial in products liability litigation when the question of punitive damages was not at issue. 783 P.2d at 1349.

An improper argument only requires reversal of a verdict when prejudice has resulted which prevents a fair trial. Krueger, 783 P.2d at 1349 (citations omitted). No proof has been offered that the closing argument by Lori's attorney served to inflate the jury verdict. See, e.g., FMC Corp v. Brown (Ind. 1990), 551 N.E.2d 444. We hold that National Crane was not prejudiced by the closing argument and is not, therefore, entitled to a new trial on that basis.

X

Did the District Court err in its evidentiary rulings relating to Lori Lutz's miscarriage and remarriage?

The District Court admitted evidence, over National Crane's objection, that Lori suffered a miscarriage ten days prior to trial. National Crane contends that the testimony was irrelevant and inflammatory, and presented with the intent of eliciting sympathy from the jury.

National Crane had no objection to Lori testifying that she wanted to have two or three children and agreed not to cross-examine her on that point. Lori contends that her desire to have children serves as evidence of the serious impact of the loss of her husband. She asserts that nothing better illustrates her loss of consortium than the fact of her pregnancy.

27

The court, aware of National Crane's concerns, limited the testimony of the miscarriage to function as proof of Lori's intent to have a family. A district court is vested with the discretion to weigh the probative value of the evidence against its prejudicial effect, and to admit or exclude the evidence. Cissel v. Western Plumbing and Heating, Inc. (1980), 188 Mont. 149, 158, 612 P.2d 206, 211 (citation omitted). Since National Crane has made no showing of prejudice as a result of the admission of this evidence, we hold that the District Court committed no error and did not abuse its discretion.

National Crane also contends that the court should have allowed voir dire to determine if any of the jurors knew Lori's new husband, Les Oldenberger (without identifying his relationship to Lutz). The purpose of the questioning was not to establish that Lori had remarried, but to determine if any of the prospective jurors should be excused for cause pursuant to § 25-7-223, MCA.

We have previously established that a spouse's remarriage cannot be introduced in a wrongful death action to reduce damages. Workman v. McIntyre Construction Co. (1980), 190 Mont. 5, 13, 617 P.2d 1281, 1285. However, the District Court in Workman did allow counsel to question the jury panel during voir dire about whether they knew the plaintiff's new wife without reference to plaintiff's marriage to her. Workman, 617 P.2d at 1285. The defendant in that case disregarded the court's order and asked the jury panel if they knew the plaintiff's "present wife," which was prejudicial and reversible error. Workman, 617 P.2d at 1285.

28

Certainly the trial court must allow counsel to identify potential jurors who may be acquainted with or who may be related to a wrongful death plaintiff's new spouse in order to allow counsel to intelligently challenge such a potential juror. If that sort of voir dire is allowed in open court, then questioning must be carefully conducted so that no reference is made to the remarriage or to the relationship of the new spouse to plaintiff. Voir dire in open court should be limited to determining whether any of the panel is acquainted with or is related by blood or marriage to the new spouse. If a panel member responds in the affirmative, then any further questioning should take place outside the presence of the panel.

In the instant case, we conclude that the District Court erred in that it should have allowed National Crane to voir dire the prospective jurors about whether they knew or were somehow acquainted with, or related to, Les Oldenberger. However, National Crane has failed to show any prejudice by providing evidence that any juror would have been challenged by reason of his or her acquaintance with, or relationship to, Lori's new husband. Accordingly, we hold that, while the District Court erred, the error was harmless.

In light of our rulings on the affirmative defenses of misuse and assumption of risk, we remand and instruct the District Court to remove the 20 percent liability the jury apportioned to Lutz and

29

instruct the District Court to reinstate the jury's full verdict of $815,400, minus the $110,000 paid by other defendants.

/s/ John Conway Harrison
Justice

We concur:

_____
Chief Justice

_____
/s/ William E. Hunt Sr.
/s/
/s/
_____
Justices

30

Justice Karla M. Gray, dissenting.

I respectfully dissent from the Court's opinion on the issue of submitting the affirmative defense of assumption of the risk to the jury, and I specially concur on the issue of whether the District Court should have recused itself. In all other respects, I join in the Court's opinion.

With regard to the assumption of the risk issue, my disagreements with the Court's analysis are several. First, it is my view that the Court's extensive reliance on Krueger vis-a-vis the assumption of the risk defense is misplaced. At the time of the incident and lawsuit underlying Krueger, § 27-1-719(5)(a), MCA---statutorily defining the assumption of the risk defense---had not been enacted and this Court proceeded on common law interpretations of that defense. (The Court's statement that § 27-1-719, MCA, was not in effect when Krueger was decided is incorrect; the statute was in effect but not applicable to the case.) Nor is there any suggestion in the legislative history that the statute was intended by the legislature merely to codify this Court's Krueger definition of the assumption of the risk defense in products liability cases. Krueger has no relevance here in light of the necessity of applying § 27-1-719(5)(a), MCA, to this case.

Second, the Court's interpretation of the assumption of the risk defense is circuitous at best and legally insupportable. The Court concludes that if the statutory misuse defense is unavailable as a matter of law, as I agree it is here, then the assumption of

31

the risk defense also is unavailable as a matter of law. The rationale offered for this conclusion is that if "unreasonable misuse" in the context of the misuse definition does not exist as a matter of law, it is impossible as a matter of law for "unreasonable use" to exist in the context of the assumption of the risk definition. While this proposition has a simplistic logical appeal, it conveniently ignores the Court's own emphasis on the different perspectives involved in the two defenses.

In discussing the misuse defense, the Court carefully and properly explains that the question of reasonable or unreasonable misuse involves the manufacturer's perspective: whether the manufacturer can or should reasonably foresee that its product is subject to misuse in a certain fashion. Then, in discussing the assumption of the risk defense, the Court goes to some length to explain that the applicable standard regarding that defense is the subjective perspective of the user: what this user knew of the defect and, on that basis, whether this user's use of the product was unreasonable.

The Court then erases this careful distinction between perspectives by concluding that because the misuse defense is unavailable as a matter of law based on National Crane's admitted ability to reasonably foresee the unloading misuse, so, too, is the assumption of the risk defense unavailable as a matter of law. The subjective perspective of the user of the product, on which the assumption of the risk defense is premised, simply disappears from the Court's analysis at this point. The end result is to

32

emasculate the legislature's careful enunciation of two separate statutory defenses to products liability cases. I cannot agree.

Moreover, I disagree with the Court's suggestion that establishing the assumption of the risk defense requires proof that the user of the product must know the accident is actually going to occur and still continue using the product. At best, this is a Krueger-based standard, while the case before us is governed by § 27-1-719, MCA. Establishing the defense pursuant to § 27-1-719, MCA, requires proof of two elements: (1) that the user of the product knew of the defect; and (2) that, based on that knowledge, the user unreasonably made use of the product. The Court adds a third element--that the user know the accident is actually going to occur--to a defense defined by the Montana legislature; again, I cannot agree.

As a final matter relating to the assumption of the risk defense, and based on my analysis of that defense, I would reverse a number of the District Court's evidentiary rulings relating to this defense. National Crane was impermissibly prohibited from presenting its case on the question of Lutz's knowledge, the foundational element of the defense.

Finally, with regard to the recusal issue, I agree with the Court that § 3-1-803, MCA, did not preclude the District Court from sitting in this case. I also agree that any "aura of possible bias or prejudice" which existed here did not rise to the level we determined to be inappropriate as a matter of law in Washington v. Mont. Mining Prop. (1990), 243 Mont. 509, 795 P.2d 460. I am

33

concerned, however, that we not minimize in any way the crucial import of judges' consideration of these matters.

Our sensitivity as judges to appearances of impropriety, and to requests for recusal on that basis, is of critical importance in preserving the integrity of, and the people's trust in, the judicial system and the administration of justice. The standards set forth in § 3-1-803, MCA, are <u>minimal</u> standards; they are the lines beyond which we <u>cannot</u> go in deciding whether it is appropriate to sit on a particular case. But those statutory standards do not begin to reach the mandate of the Canons of Judicial Ethics which requires us to avoid both impropriety and the appearance of impropriety.

It is our duty as judges to ensure that people's confidence in the ability of courts to administer justice will not be diminished. We must be ever vigilant and sensitive with regard to whether our own relationship to parties or particular cases will reasonably appear improper to the people of Montana who entrust their system of justice to us. In considering whether recusal is appropriate in a given case, whether on motion of a party or on personal reflection, we must err on the side of caution. Only then can we meet the standard set out in Rex v. Sussex Justices (1924), 1 k.b. 256, 259, that "[n]othing is to be done which creates even a suspicion that there has been an improper interference with the course of justice."

_____
Justice

Chief Justice Turnage:
    I join in the dissent of Justice Gray.

_____
Chief Justice

Justice Fred J. Weber dissents as follows:

I -- Misuse

Did the District Court err by submitting the affirmative defense of misuse to the jury?

I respectfully dissent on Issue one of the majority opinion. Section 27-1-719, MCA, states that the affirmative defense of "unreasonable misuse" can be used in products liability cases. Unreasonable misuse is defined as "use of a product in a manner that is not reasonably foreseeable by the manufacturer." T. Traverse, 3d American Law of Products Liability, Foreseeability of Misuse, § 42.8, p. 18 (1987). This is consistent with the contention of National Crane as pointed out in the majority opinion. As further pointed out in the majority opinion, plaintiff contends that while unreasonable misuse is a recognized defense, reasonably foreseeable misuse is not recognized as a defense. Plaintiff contends that in light of the clear foreseeability, this Court should determine as a matter of law that the affirmative defense of misuse should not have been submitted to the jury.

The majority opinion states that "foreseeable misuse is reasonable misuse." I disagree with that conclusion. The result of the conclusion of the majority opinion is that even though misuse may by its very nature be classed as unreasonable, still if it was foreseeable, then it cannot be classed as unreasonable misuse. I believe that ignores the experience of modern society.

The holding of the majority opinion on this issue is stated as follows:

35

It being admitted that the alleged misuse of the crane through sideloading was reasonably foreseeable to National Crane, we hold that, as a matter of law, the affirmative defense of unreasonable misuse is unavailable to National Crane." (Emphasis added.)

A leading treatise on Products Liability sets out the facts that the factfinder can consider when trying to determine reasonably foreseeable:

> In determining whether the seller should have reasonably anticipated the use to which the product was put, the factfinder may take into account the reasonable use or uses of the product, the ordinary user's awareness that the use of the product in a certain way is dangerous, the likelihood and probable nature of use of the product by persons of limited knowledge, and the normal environment for the use of the product and the foreseeable risk in such environment, as well as any other evidence that may or may not cause the seller to reasonably anticipate such use. (Emphasis added.)

T. Traverse, 3d American Law of Products Liability, Foreseeability of Misuse, §42.8, p. 20 (1987). The key aspect of the above quote is that the factfinder is required to sift through the facts and make the determination. I cannot agree with the elimination of the jury as the finder of fact on this critical issue.

In substance the majority opinion concludes that if a defendant acknowledges the foreseeability of the misuse, regardless of how unreasonable such misuse may be, that party may not assert the defense of unreasonable misuse as a matter of law. I disagree with that analysis. The key aspect is that the trier of fact must consider all of the evidence and thereby determine whether or not the misuse was in fact reasonable or unreasonable under all of the circumstances.

Perhaps an analogy will be of some assistance in this

36

analysis. In my analogy, I assume that John Smith has purchased an American automobile which has a capacity to go 100 mph. I further assume that in driving the car at 90 mph he is involved in a high speed accident which results in his death. I next assume that the estate of John Smith brings an action against the automobile manufacturer in which the estate contends that because it was clearly foreseeable that a purchaser of the automobile might drive at the speed of 90 mph, it was negligent as a matter of law for the manufacturer to fail to install a governor which would prevent driving in excess of 75 mph. Would it be appropriate in this analogy for the estate of Smith to contend that the automobile manufacturer cannot use the affirmative defense of unreasonable misuse because the manufacturer could foresee the misuse of the automobile by driving at 90 mph. I would not agree that a district court could conclude as a matter of law that this knowledge bars the manufacturer from presenting the issue of unreasonable misuse to a jury. This analogy has more clearly emphasized to me the importance of allowing the trier of fact to consider all of the facts before reaching a conclusion.

The majority holds that it has been admitted that the alleged misuse of the crane through sideloading was reasonably foreseeable to National Crane and that, as a matter of law, the affirmative defense of unreasonable misuse is unavailable to National Crane. In reaching such a conclusion, the majority has substituted this Court as trier of fact in place of the jury to which that obligation has been given. I would allow any additional evidence

37

bearing upon unreasonable misuse which may be submitted by either party and would allow the jury to determine whether the facts demonstrated an unreasonable misuse on the part of Mr. Lutz.

I would reverse and remand for a new trial.

## II -- Assumption of Risk Defense.

Did the District Court err in submitting the defense of assumption of the risk to the jury?

While I believe that the issue of assumption of the risk should have been presented to the jury, I disagree totally with the manner in which the court submitted the issue to the jury. What the court did in this instance was create an impossible situation for the defendant. Assumption of risk is a defense to a charge of strict liability. Section 27-1-719, MCA. In order for defendant to prove this defense, it must present evidence at trial of the following:

1.     National Crane had to prove that the deceased had subjective knowledge of the product's defect or that the defect was open and obvious.

2.     The deceased voluntarily used the product, and

3.     The use of the product was unreasonable.

What the court did in this instance was prevent introduction of any evidence that might have gone to prove what Lutz's state of understanding about the product actually was. The court did this under the mistaken belief that the evidence was being presented for the purpose of proving negligence. Having forbidden defendant the opportunity to present evidence to prove the above three elements,

38

the court then submitted the issue to the jury.

The majority looks at this situation and holds that because insufficient evidence was presented at trial to prove the above three elements, the court should not have presented the jury with the opportunity to consider the defense. The majority overlooks entirely the real problem and that is the court's refusal to permit evidence by which National Crane could prove the elements needed to sustain its burden of proving assumption of the risk.

The majority has misapprehended the fine line between negligence and assumption of the risk, that it so precisely defines in its opinion. Negligence requires proof of what any reasonable person would have done under the circumstances. Assumption of the risk needs subjective proof only. What did the deceased know? What did the deceased believe? Any evidence that goes to prove what Lutz knew about the possible risks that he was taking by performing his job in the manner he performed his job is pertinent and the court should have permitted the evidence of same. The majority notes the difference between negligence and assumption of the risk, but then proceeds to the conclusion that the evidence that was forbidden was evidence of negligence.

Next, the majority says 'well, it doesn't matter anyway because there is no way that National Crane could have proven that critical third element of assumption of the risk'--that deceased unreasonably misused the product. The majority states that it has already determined in Issue one that sideloading was not unreasonable use because the manufacturer foresaw this use. I

39

reiterate, the issue of whether the deceased was in actuality sideloading is something that the jury should decide.

Again the majority has misapprehended what needs to be proven here. "Reasonableness refers to whether the plaintiff had a reasonable opportunity to elect whether or not to subject himself to the danger." T. Traverse, 3d Modern Law of Products Liability, Assumption of Risk, § 41:9, p. 18 (1987). For the majority to, here, equate the manufacturer's foresight with the subjective determination that deceased made as to the reasonableness of subjecting himself to the risk, is totally erroneous.

What we have here is a circular argument by the majority that eliminates the defense of assumption of the risk. In addition, the trial court gave the following jury instruction on assumption of the risk:

> The Defendant has the burden of proving that Gerald Lutz assumed the risk of his injuries. To establish this defense, the Defendant must prove:
>
> 1. That Gerald Lutz actually knew before he was injured that the crane cable would touch the power line if the pipe was lifted;
>
> 2. That knowing this, Gerald Lutz voluntarily exposed himself to the danger; and
>
> 3. That Gerald Lutz unreasonably exposed himself to that danger.

First of all, National Crane had to prove not that Lutz knew that the cable would touch the wire but whether: "the plaintiff does not understand the risk involved in a known situation." Krueger v. General Motors Corp. (1989), 240 Mont. 266, 276, 783 P.2d 1340, 1347. A 'known situation' would be the activity of

40

sideloading logs in an area where a power line is close. The court cast an improper light on what National Crane had to prove in order to sustain their burden for the defense. There is no way to prove that the deceased had a death wish. But evidence did exist to show that Lutz knew that sideloading in an area where power lines were close was dangerous. There is no way for National Crane to have met the requirement of the instruction as given.

I conclude that the court improperly withheld pertinent evidence concerning assumption of the risk from the jury--but nevertheless proceeded to erroneously instruct the jury on assumption of the risk by throwing an impossible burden on the defendant.

I would hold that the court erred and that the case should be reversed and remanded for new trial on this issue also.

_____
Justice

41