JUSTICE MORRIS
delivered the Opinion of the Court.
*328 ¶1 Chad and Jessica Malcolm (collectively Malcolms) sued Evenflo Company, Inc. (Evenflo) after their four-month-old son Tyler suffered fatal brain injuries in a rollover car accident. The Malcolms alleged that the Evenflo ‘On My Way” (OMW) child safety seat contained a design defect that caused Tyler’s death. The Malcolms asserted strict liability in tort. Evenflo appeals from a judgment in the Sixth Judicial District, Park County, following a jury trial. We affirm in part, reverse in part, and remand for further proceedings.
¶2 We review the following issues on appeal:
¶3 Did the District Court abuse its discretion when it excluded Evenflo’s evidence that the OMW model 207 complied with FMVSS 213 for the purposes of compensatory damages ?
¶4 Did the District Court abuse its discretion by admitting evidence regarding the recall and test failures of the OMW model 206?
¶5 Did the District Court abuse its discretion by applying unfairly its FMVSS 213 evidentiary ruling with respect to compensatory damages?
¶6 Did the District Court abuse its discretion when it excluded Evenflo’s FMVSS 213 compliance evidence with respect to punitive damages?
FACTUAL AND PROCEDURAL BACKGROUND The ‘On My Way” Child Safety Seat
¶7 Evenflo manufactures child restraint systems, or child seats. Evenflo marketed the OMW as a rear-facing vehicle child safety seat intended for transporting infants weighing up to 20 pounds. Evenflo designed the OMW for use with or without its detachable base. The user routed the vehicle’s seat belt through an enclosed seat belt “tunnel” on the base when they used the detachable base. The seat then latched into the base. The user also could unlatch the seat from the base and use it as a baby carrier. When used without the base, Evenflo designed the seat belt to be slipped into a U-shaped, open-ended plastic seat belt hook on one side of the seat. The user would route the seat belt over the seat’s foot-end and through an open-ended plastic seat belt hook on the other side of the seat. The user then latched the seat belt into the vehicle’s seat belt buckle.
¶8 The National Highway Traffic and Safety Administration (NHTSA) requires that all child restraint systems comply with the minimum requirements of Federal Motor Vehicle Safety Standard 213 (FMVSS 213). See 49 C.F.R. §571.213 (2009). NHTSArequired Evenflo to conduct internal testing of the OMW to determine if it complied with the FMVSS 213 standards. NHTSA and Transport Canada, the *329 Canadian testing agency, conducted random audit FMVSS 213 tests in addition to Evenflo’s internal testing.
¶9 FMVSS testing consists in part of a front-end sled test at speeds of 27-30 mph. See 49 C.F.R. § 571.213 (1994). In the sled test, the tester accelerates a child restraint seat and a test dummy to 30 mph and crashes it into a frontal barrier. The child restraint seat must manage the force from the crash “so that the forces imparted to the dummy are within tolerable limits.” 67 Fed. Reg. 21806, 21812 (May 1, 2002). FMVSS 213 does not require side-impact, rear-impact, or rollover testing.
¶10 Evenflo first manufactured the OMW model 206 in May of 1994. By February of 1995, Evenflo’s internal testing indicated that the production model 206 was prone to failure of the plastic seat belt hooks and/or the adjacent plastic shell. Internal videotapes showed the OMW seats breaking apart in the area of the vehicle seat belt path. The breaking caused the OMW to come loose from the test sled’s seat belt. The videotapes depicted the OMW ejecting from the sled due to the open belt hook design.
¶11 Evenflo briefly halted production of the OMW. Evenflo notified NHTSA on June 12, 1995, that it was going to conduct a “consumer corrective action/recall campaign” as the OMW did not meet the requirements of FMVSS 213. Evenflo represented to NHTSA that the hazard posed by the design of the OMW model 206 was a “separation” under the seat’s cloth padding that resulted in a sharp edge that could cause a “cut or pinch” hazard to the child. Evenflo did not notify NHTSA that the OMW’s belt hooks had broken off in some tests and that these breaks had caused the OMW to detach from the vehicle restraint system.
¶12 Evenflo had manufactured and sold approximately 200,000 OMWs at the time of the recall. Evenflo designed a plastic “retrofit kit” to be riveted into the underside of the safety seat. Evenflo mailed the plastic retrofit kit to the current OMW users. Evenflo described the recall as a “consumer corrective action” and instructed the OMW owners to install the plastic insert using double-sided tape. Evenflo also had approximately 55,000 OMW model 206s in its inventory at the time of the recall. Evenflo installed the retrofit kit on its unsold inventory. Evenflo rebranded the retrofitted OMWs as model 207x and sent all 55,000 seats to retailers.
¶13 Evenflo altered the plastic mold used to create the OMW at a total cost of $2500. Evenflo added ribs, gussets, and fillets and designated the modified OMW as model 207. Evenflo did not change the OMW’s *330 open belt hook design. Evenflo resumed production of the OMW model 207 in July of 1995.
¶14 In 1997, Ruthie Gonzales of Merced, California, reported to Evenflo that her retrofitted model 207 OMW’s belt hook had broken off during a rollover accident. The OMW came loose from the seatbelt and ended up on her front dashboard. Devon Orneleas of Patterson, California, reported to Evenflo on August 10, 1999, that both belt hooks had broken off her production model 207 in a rollover accident. Ms. Orneleas testified that the OMW came loose from the vehicle seat belt and flew forward when the seat hooks fractured and broke away. Ms. Orneleas found her baby, still secured in the child seat, on the front seat floorboard after the rollover.
¶15 Ms. Orneleas testified that she had reported the incident because she wanted Evenflo to know “that they had a defective product and I wanted them to recall it.” Ms. Orneleas testified that when she called Evenflo, the customer service representative said that “she was shocked and hadn’t heard of that before.” Ms. Orneleas further testified that Evenflo had called her back and told her that the OMW was designed to withstand only a 30 mph frontal crash, rather than the physical forces present in a rollover crash.
¶16 Evenflo denied that it had made this statement and claimed that Ms. Orneleas “must have misunderstood.” Three other OMW owners also called Evenflo in the years before the Malcolm accident to report that seatbelts had slipped out of the open belt hook of the OMW in rollover, side-impact, and rear-end situations. Evenflo did not test the OMW in rear-end, side impact, or rollover scenarios before the Malcolm accident.
The Malcolm Accident
¶17 The Malcolms lived south of Livingston, Montana, on a ranch near Emigrant. Chad Malcolm was the fourth generation of the family to ranch in the area. A friend gave Jessica Malcolm the OMW while Jessica was pregnant with Tyler. Jessica called Evenflo to ask if the OMW model 207 was safe to use. Evenflo assured her that the OMW was not subject to any of their recalls and that the OMW was safe to use. Evenflo Director of Product Safety Randolph Kiser testified that Jessica Malcolm did not have a right to know about the cracking during testing or the owner reports of seatbelts slipping out of the open belt hooks unless Evenflo considered the problem to be a “rampant safety related defect.”
¶18 Jessica Malcolm drove to Emigrant on the evening of July 16, 2000, in her 1996 Suburban to pick up pizza and a movie with her *331 sister and her son Tyler. She then drove back south on Highway 89 toward the ranch. Malcolm’s sister rode in the passenger seat and Tyler rode in the back in the OMW model 207 child seat. A northbound motorist swerved into Malcolm’s lane and forced Malcolm off the road. The Suburban rolled three times, traveled down a steep incline, and stopped in a ditch. The accident occurred within sight of the Malcolms’ ranch.
¶19 Jessica Malcolm did not suffer serious injury. Her sister sustained a severe head injury. The left belt hook of the OMW broke off during the rollover. The seat belt slipped out from the open-ended belt hook on the opposite side of the seat. The forces of the accident ejected the OMW from the Suburban. The OMW came to rest approximately 60 feet from the Suburban. Tyler remained strapped in the OMW. Tyler suffered brain injuries that resulted in his death.
Pretrial
¶20 The Malcolms’ case sounded exclusively in strict liability in tort, design defect theory. The Malcolms claimed that the Evenflo OMW model 207 infant child safety seat constituted a defectively designed product that failed catastrophically even though they had used the seat in a reasonably anticipated manner. The Malcolms pointed to the OMW’s open-ended belt hook design and the lack of expanded polystyrene (EPS) padding. The Malcolms contended that Evenflo could have manufactured the OMW using a feasible superior alternative design that required the vehicle’s seatbelt to be routed through an enclosed seat belt tunnel even when the seat was used without the base. The Malcolms also sought punitive damages. The Malcolms alleged that Evenflo “continued selling the defective product in conscious, deliberate and intentional disregard of the danger presented.”
¶21 Evenflo contended that the OMW model 207 was not defective in any way. Evenflo argued that the severity of the forces involved in the accident solely caused Tyler’s death. Evenflo argued that the “tremendous forces” that occurred during the rollover forced open the rear passenger door, which was immediately adjacent to Tyler’s child seat. Evenflo posited that Tyler’s car seat came into direct contact with the ground as the Suburban rolled. Evenflo suggested that the contact caused the seat to detach from the seat belt system and ultimately fly out the open door. Evenflo emphasized that the production model 207 passed each of the FMVSS tests conducted on the seat. Evenflo also argued that the OMW model 207 differed completely from the OMW model 206.
*332 ¶22 The parties conducted extensive discovery and filed numerous pretrial motions. Evenflo contended in its motion for partial summary judgment on the issue of punitive damages that “there is a complete absence of evidence of either actual fraud or actual malice.” Evenflo also claimed that its alleged compliance with FMVSS 213 preempted the Malcolms’ punitive damages claim. The District Court rejected Evenflo’s preemption claim and concluded that Evenflo had failed to show an absence of genuine issues of material fact regarding punitive damages.
¶23 The District Court granted the Malcolms’ motion in limine to exclude arguments by Evenflo that the OMW model 207 complied with FMVSS 213. The District Court reasoned that evidence of compliance with FMVSS 213 “does not appear to be relevant to the issues or facts in this case.” The District Court stated that even if evidence of Evenflo’s alleged compliance with FMVSS 213 was relevant, “it is more prejudicial than probative and would confuse the jury.” The District Court denied Evenflo’s motion for reconsideration.
Trial
¶24 The District Court conducted a jury trial from July 16 to July 25, 2007. The Malcolms testified as to the severe trauma that resulted from Tyler’s death. Jessica and Chad both had undergone personality changes. Chad Malcolm no longer could perform competently the daily ranch work. The Malcolms could not face living in such close proximity to the location of the accident. The Malcolms eventually moved into Livingston. Chad went to work for a gravel company. Jessica obtained certification as a child seat fit expert and advocated for safer child seats.
¶25 Both sides presented expert witnesses. The Malcolms contended that the OMW model 206 and model 207 were identical with respect to the faulty design of the open belt hook and the lack of padding. The Malcolms’ design expert Lou D’Aulerio testified that he had analyzed 582 sled tests conducted on the OMW under the FMVSS 213 standards. The tests included the OMW models 206 and 207 and prototypes. D’Aulerio compiled an 11-page chart titled‘Chronological List of Test Failures.” The chart included a column of ‘Test Report Remarks” that consisted of excerpts from the test reports that described cracks, tears, and other ‘failures” of the shell. D’Aulerio determined that Evenflo had noted that the plastic shell had cracked or fractured in 157, or 27%, of the tests. D’Aulerio designated these tests ‘failures.” The Malcolms also mentioned these test ‘failures” during their opening statement and closing argument.
*333 ¶26 Evenflo argued that many of the tests cited by D’Aulerio were irrelevant because they involved models other than the model 207. Evenflo insisted that the District Court should allow Evenflo to respond to D’Aulerio’s testimony by introducing evidence that the OMW model 207 had passed each test based on FMVSS 213 standards. Evenflo contended that the District Court unfairly was applying its motion in limine regarding FMVSS 213 testing by allowing the Malcolms to introduce evidence that the OMW model 206 had ‘failed” during testing without allowing Evenflo to introduce evidence that the OMW model 207 had “passed” according to the minimal requirements of FMVSS 213 in each of those instances. The District Court rejected Evenflo’s arguments regarding FMVSS 213.
¶27 The jury awarded the Malcolms $6,697,491 in compensatory damages. The jury also awarded the Malcolms $3,700,000 in punitive damages in a separate proceeding conducted the following day, pursuant to §27-l-221(7)(a), MCA.
Post-trial
¶28 The District Court reviewed the jury’s award of punitive damages as required by §27-l-221(7)(c), MCA. Evenflo argued that the court improperly had excluded evidence of Evenflo’s compliance with FMVSS 213. Evenflo relied in part on this Court’s decision in Sunburst School Dist. No. 2 v. Texaco, Inc., 2007 MT 183, 338 Mont. 259, 165 P.3d 1079, which we decided after the jury’s verdict in this case. The District Court affirmed the jury’s punitive damages award. The District Court also denied Evenflo’s post-trial motions, including its motion for a new trial, motion for remittitur, motion for judgment as a matter of law. Evenflo appeals.
STANDARD OF REVIEW
¶29 We review a district court’s evidentiary rulings for an abuse of discretion. Sunburst, ¶ 74. A district court possesses broad discretion to determine the admissibility of evidence. Sunburst, ¶ 74. A district court abuses its discretion when it acts arbitrarily without conscientious judgment or so exceeds the bounds of reason as to work a substantial injustice. State v. Giddings, 2009 MT 61, ¶ 42, 349 Mont. 347, 208 P.3d 363.
DISCUSSION
¶30 Did the District Court abuse its discretion when it excluded Evenflo’s evidence that the OMW model 207 complied with FMVSS 213 for the purposes of compensatory damages ?
*334 ¶31 Section 27-1-719, MCA, governs design defect liability in Montana. A person who sells a product in a defective condition is liable for the physical harm caused by the defective product. Section 27-1-719, MCA; Wise v. Ford Motor Company, 284 Mont. 336, 340, 943 P.2d 1310, 1312 (1997). A product is defective if it is dangerous to an extent beyond that anticipated by the ordinary user. McAlpine v. Rhone-Poulenc Ag Co., 2000 MT 383, ¶ 25, 304 Mont. 31, 16 P.3d 1054; Mont. Pattern Jury Instr. Civ. 7.01 (2d rev. ed. 2003).
¶32 Strict liability recognizes that the seller is in the best position to insure product safety. Sternhagen v. Dow Co., 282 Mont. 168, 180, 935 P.2d 1139, 1146 (1997). Design defect liability therefore places the risk of loss on the manufacturer. This imposition of risk provides “an incentive to design and produce fail-safe products which exceed reasonable standards of safety.” Sternhagen, 282 Mont. at 178, 935 P.2d at 1145. Design defect strict liability may be imposed even if the seller has “exercised all possible care,” and even though the product was faultlessly manufactured. See McAlpine, ¶¶ 17, 21; § 27-1-719, MCA; Mont. Pattern Jury Instr. Civ. 7.00, 7.02 (2d rev. ed. 2003).
¶33 Evenflo argues that the District Court abused its discretion when it excluded any evidence that the OMW model 207 complied with FMVSS 213. Evenflo contends that the fact that the OMW model 207 passed 341 tests performed under FMVSS 213 is ‘highly relevant to [the Malcolms’] claim that the model 207 was defective and unreasonably dangerous.”Evenflo opines that FMVSS 213 is a “severe” test with “strict performance standards.”
¶34 Evenflo urges this Court to adopt the Restatement (Third) of Torts: Products Liability §4 (1998). Section 4 provides that compliance with an applicable regulation is admissible in connection with liability for defective design. Evenflo contends that the majority ofjurisdictions hold that compliance with product safety regulation is relevant and admissible on the question of defectiveness, but is not necessarily controlling. Evenflo also contends that this Court has adopted the Restatement (Third) approach in the negligence context. Evenflo argues that ‘Tt]here is no reason why such highly relevant evidence should be admissible in negligence, but not products liability cases.”
¶35 Evenflo points to Martel v. Montana Power Co., 231 Mont. 96, 752 P.2d 140 (1988). Martel suffered severe injuries after coming into contact with power lines owned by Montana Power. Martel, 231 Mont. at 98-99, 752 P.2d at 142. Martel alleged that Montana Power negligently had failed to comply with the National Electric Safety Code. Martel, 231 Mont. at 100-03, 752 P.2d at 142-45. The Court held *335 that a violation of “design standards intended to protect the public” constitutes negligence per se. Martel, 231 Mont. at 103, 752 P.2d at 145. The Court further noted that bare compliance with such a statute does not necessarily establish due care. Martel, 231 Mont. at 104, 752 P.2d at 145.
¶36 This Court reiterated those principles in Schmidt v. Washington Contractors Group, Inc., 1998 MT 194, 290 Mont. 276, 964 P.2d 34. Schmidt sustained injuries when he crashed his motorcycle while descending a temporary freeway entrance ramp in a construction zone. Schmidt, ¶ 3. The Court noted that the construction company owed a duty of ordinary care in maintaining the road construction site in a reasonably safe condition. Schmidt, ¶ 15. The construction company argued that it was not negligent as it properly had posted warning signs as required by the Manual of Uniform Traffic Control Devices (MUTCD). Schmidt, ¶ 12. The Court stated that “evidence of compliance with the MUTCD does not necessarily establish due care because the MUTCD, like any other national industry standard or code, is only a minimum standard.” Schmidt, ¶ 17.
¶37 The District Court correctly recognized, however, that Montana draws “a bright line”between cases asserting strict liability in tort and those grounded in negligence theory. The court pointed to Lutz v. National Crane Corp., 267 Mont. 368, 385, 884 P.2d 455, 465 (1994). Lutz died from electrocution when a crane’s cable contacted a power line. Lutz, 267 Mont. at 372, 884 P.2d at 457. Lutz’s estate claimed that the crane’s failure to include insulating links constituted a defective design. Lutz, 267 Mont. at 372-73, 884 P.2d at 457. The manufacturer attempted to introduce evidence that governmental regulations did not require that cranes be equipped with insulated links. Lutz, 267 Mont. at 384, 884 P.2d at 464. This Court affirmed the district court’s exclusion of the evidence. Lutz, 267 Mont. at 385, 884 P.2d at 465. The Court observed that Twjhile most courts allow government regulations to be used against manufacturers in negligence cases, the same is not true where the issue is strict liability.” Lutz, 267 Mont. at 385, 884 P.2d at 465. The Court emphasized that ‘[the] issue in products liability cases is not the conduct of the ‘reasonable person,’ but the condition of the product.” Lutz, 267 Mont. at 380, 884 P.2d at 462 (emphasis in original). The Court rejected the manufacturer’s attempt ‘to interject negligence concepts into this design defect case.” Lutz, 267 Mont. at 379, 884 P.2d at 461.
¶38 This Court again distinguished strict liability from negligence when it rejected the “state of the art” defense in Sternhagen, 282 Mont. *336 at 182, 935 P.2d at 1147. The Court determined that the state of the art defense “raises issues of reasonableness and foreseeablility-eoncepts fundamental to negligence lawLo determine a manufacturer’s liability.” Sternhagen, 282 Mont. at 176, 935 P.2d at 1144. The attempt to inject negligence principles into strict liability law would “sever Montana’s strict products liability law from the core principles for which it was adopted-maximum protection for consumers against dangerous defects in manufactured products.” Sternhagen, 282 Mont. at 176, 935 P.2d at 1144. The Court recognized that the focus in design defect cases shines on “the condition of the product,” rather than ‘the manufacturer’s conduct or knowledge.” Sternhagen, 282 Mont. at 176, 935 P.2d at 1144. The Court determined that the “strict duty mandated by the theory of strict liability is warranted even though in some situations it may result in liability being imposed upon careful manufacturers.” Sternhagen, 282 Mont. at 178, 935 P.2d at 1145.
¶39 We likewise reject Evenflo’s efforts to inject negligence principles into the strict liability setting. We decline to adopt the Restatement (Third) of Torts: Products Liability, §4. Section 4 conflicts with the core principles of Montana’s strict products liability law. To recognize Section 4 improperly would inject into strict products liability analysis the manufacturer’s reasonableness and level of care-eoncepts that are fundamental to negligence law, but irrelevant on the issue of design defect liability. Sternhagen, 282 Mont. at 176, 935 P.2d at 1144; McAlpine, ¶¶ 17, 21; §27-1-719, MCA; Mont. Pattern Jury Instr. Civ. 7.00, 7.02 (2d rev. ed. 2003). The District Court correctly relied upon Montana precedent that emphasizes the fundamental difference between strict liability and negligence law. See Sternhagen, 282 Mont. at 176, 935 P.2d at 1144; Lutz, 267 Mont. at 379-80, 884 P.2d at 461-62; see also Kuiper v. Goodyear Tire & Rubber Co., 207 Mont. 37, 63-64, 673 P.2d 1208, 1222.
¶40 The Dissent raises the specter of the “camel’s nose in the tent” despite our explicit rejection of the Restatement (Third) of Torts: Products Liability §4. See ¶ 119. The Dissent insists that our decision somehow will assist corporations to overturn “well-settled, decades-old principles of strict liability” and convince the courts or the legislature to adopt the Restatement (Third) of Torts: Products Liability §4. We discuss at length and approve in ¶¶ 31-39 the ‘Well-settled, decades-old principles of strict liability” for which the dissent fears. Our decision in fact slams the door on the camel’s nose. Only in a desert mirage could our clear repudiation of th e Restatement (Third) of Torts: *337 Products Liability §4, and our corresponding affirmation of the “well-settled, decades-old principles of strict liability,” be seen to facilitate the camel’s entry into the tent.
¶41 A district court abuses its broad discretion regarding the admissibility of evidence if it acts arbitrarily without conscientious judgment or so exceeds the bounds of reason so as to work a substantial injustice. Sunburst, ¶ 74; Giddings, ¶ 42. The District Court extensively analyzed both FMVSS 213 and the nature of the Malcolm accident in determining that evidence of compliance with FMVSS 213 would not be relevant to the question of whether Evenflo had sold the OMW model 207 in a defective condition. The District Court emphasized in its post-trial order that the FMVSS 213 “addresses only minimum levels of performance in 27-30 mph frontal impacts.”The court further noted that ‘FMVSS 213 does not set forth any requirements, or create any reasonable expectations in the mind of the manufacturer, concerning the dynamic performance of a child seat in a motor vehicle rollover.” The court stated that evidence at trial had established that “the dynamic forces unleashed in a high-speed rollover collision are very different from those present in a minimal 27 to 30 mph frontal crash.”
¶42 The District Court added that “the risk of mischief and jury confusion” inherent in allowing Evenflo to defend based on the “self-serving” argument that the OMW model 207 had “passed”FMVSS 213 was “particularly apparent when the limited purpose of the federal motor vehicle standards is viewed in the light of Montana products liability law.” The District Court recognized that the safety standards are “a minimum standard for motor vehicle or motor vehicle equipment performance.” See 49 U.S.C. §30102(a)(9) (2006). The court emphasized that Congress has established that a person may not use compliance with a motor vehicle safety standard as a defense at common law and compliance does not exempt a person from liability at common law. See 49 U.S.C. §30103(e) (2006); H.R. Rpt. 1776 at 24 (July 28, 1966).
¶43 The District Court also highlighted the letter of NHTSA Administrator Ricardo Martinez, M.D., sent to manufacturers, including Evenflo, on September 14, 1999. Dr. Martinez stated that ‘hiere compliance with the minimum requirements of the standard is not enough.” Dr. Martinez urged manufacturers to “ensure that their restraints perform above the minimum requirements” of the safety standards. See 65 Fed. Reg. 1224,1224-25. (Jan. 7, 2000). The District Court concluded that Dr. Martinez’s warning was “consistent with the *338 theory and goal of [Montana] law governing strict product design defect liability.” The court correctly noted that Evenflo could be liable under Montana law for design defect liability even if it had “exercised all possible care” and even if the OMW had been faultlessly manufactured. See McAlpine, ¶¶ 17, 21; § 27-1-719, MCA; Mont. Pattern Jury Instr. Civ. 7.00, 7.02 (2d rev. ed. 2003).
¶44 We conclude that the District Court did not act arbitrarily without conscientious judgment when it denied Evenflo’s evidence of compliance with FMVSS 213. Giddings, ¶ 42. The District Court acted within its “broad discretion” when it determined that evidence of the OMW model 207’s compliance with FMVSS 213 would be irrelevant to the Malcolms’ design defect strict liability claim. Sunburst, ¶ 74. We also cannot determine that the District Court abused its discretion when it concluded that even if Evenflo’s compliance with FMVSS 213’s “minimal standards” would be relevant, the evidence would be more prejudicial than probative and might tend to mislead or confuse the jury. Sunburst, ¶ 74. The District Court’s evidentiary rulings properly focused the jury’s compensatory damages analysis on the condition of the OMW rather than on the conduct of Evenflo. Lutz, 267 Mont. 368 at 380, 884 P.2d at 462.
¶45 Did the District Court abuse its discretion by admitting evidence regarding the recall and test failures of the OMW model 206?
¶46 Evenflo claims prejudice from the District Court’s decision to allow the Malcolms to introduce evidence regarding the testing and the 1995 recall of the OMW model 206. Evenflo argues that the court allowed the Malcolms to ''put on trial a different child seat” than the Malcolms’ OMW model 207. Evenflo contends that the OMW model 206 and model 207 are substantially different seats and that the mode of alleged failure that led to the model 206’s recall differed from the alleged defect in the model 207. The Malcolms argue that “an ejection due to the defective open belt hook design in a model 206 is the same as one in a 207.”
¶47 Evenflo representative Randolph Kiser testified that Evenflo had recalled the OMW model 206 due to its failure to conform to FMVSS 213. The District Court admitted letters between Evenflo and NHTSA that referred to the OMW model 206’s failure to comply with the standards of FMVSS 213. The court also admitted videos of the OMW model 206 breaking apart during FMVSS 213 testing. The District Court allowed the Malcolms’ expert D’Aulerio to testify regarding the cracks and other damage to the model 206 that had occurred during FMVSS 213 testing. The court further allowed the Malcolms to *339 introduce D’Aulerio’s ‘Test Failures” chart into evidence.
Substantial Similarity
¶48 Evenflo broadly asserts that “[i]t is generally improper in a products liability case to admit evidence regarding a product model other than the one at issue.” The three out-of-jurisdiction cases that Evenflo cites do not support its sweeping assertion. The courts in each case excluded evidence of different product models due to lack of similarity.
¶49 For example, in Brock v. Caterpillar, Inc., 94 F.3d 220 (6th Cir. 1996), Brock’s expert testified that the Caterpillar D9H bulldozer’s brake system was defective and unreasonably dangerous. Brock, 94 F.3d at 224. The trial court permitted the expert to base his opinion on a comparison with the allegedly improved braking system of the newer and much larger model DIO. Brock, 94 F.3d at 224-25. The Sixth Circuit Court of Appeals concluded that the trial court had committed prejudicial error on the grounds that the comparison between the two models at most was ‘tenuously relevant.” Brock, 94 F.3d at 225.
¶50 The court recognized that evidence of product failures “of substantial similarity” would be “relevant and admissible.” Brock, 94 F.3d at 224. The court highlighted the substantial differences between the Caterpillar model D9H and the model DIO. Brock, 94 F.3d at 224-26. The court noted that ‘there were a large number of changes in character, size, style, and technological advancement between the manufacture design of the D9H ... and that of the DIO some years later.” Brock, 94 F.3d at 225. The court emphasized that Caterpillar had not manufactured the DIO’s allegedly superior braking system until well after the accident involving the D9H. Brock, 94 F.3d at 225.
¶51 The court in McBurney Law Ser., Inc. v. Apex, Inc., 771 A.2d 911 (R.I. 2001), determined that the trial court had not abused its discretion when it refused to permit the plaintiffs to cross-examine a defense witness concerning test reports regarding two toaster products manufactured by the defendants different from the model at issue. McBurney, 771 A.2d at 912. The plaintiffs intended to use the reports to impeach the assertions of the defense’s expert witness, made in response to plaintiffs’ own questions, that these other models could not produce a relatively large fire. McBurney, 771 A.2d at 911. The court cited the fact that the toasters were different models with features that varied from those in the toaster that the plaintiffs claimed had ignited the building fire. McBurney, 771 A.2d at 911-12.
¶52 Evenflo also points to Blevins v. New Holland North America, Inc., 128 F. Supp. 2d 952, 960-61 (W.D. Va. 2001), in which the court *340 granted the defendant’s motion in limine to exclude evidence of prior accidents involving a different model hay baler than the model of baler at issue. The plaintiff sought to introduce the evidence in order to establish that New Holland had notice that baler operators tend to leave the operator’s position without stopping the machine. Blevins, 128 F. Supp. 2d at 960. The court earlier had granted summary judgment to the defendant on the plaintiffs breach of warranty claim, ‘leaving for trial the claims based on negligence.” Blevins, 128 F. Supp. 2d at 954. Montana’s strict liability law, as we discussed, involves concepts that fundamentally are different than those that are relevant to negligence law. See ¶¶ 37-39.
¶53 Montana law generally allows evidence of similar incidents in product liability cases when the dispute involves similar products. See Preston v. Montana Eighteenth Judicial Dist. Court, Gallatin County, 282 Mont. 200, 936 P.2d 814 (1997). Preston suffered a head injury caused by an allegedly defective pneumatic roofing nailer. Preston, 282 Mont. at 202, 936 P.2d at 815. The district court denied Preston’s attempt to seek discovery about various different product models that used the same allegedly faulty design. Preston filed a writ of supervisory control. Preston, 282 Mont. at 202-03, 936 P.2d at 815-16.
¶54 This Court reversed the district court’s decision. The Court emphasized that this Court previously had recognized ‘that evidence of other injuries caused by similar products is relevant and admissible.” Preston, 282 Mont. at 207, 936 P.2d at 818 (citing Kuiper, 207 Mont. at 56, 673 P.2d at 1219; Krueger v. General Motors Corp., 240 Mont. 266, 274, 783 P.2d 1340, 1346 (1989)). The Court noted that a plaintiff in a product liability action must prove that the manufacturer sold the product in a “defective condition unreasonably dangerous to a user.” Preston, 282 Mont. at 209, 936 P.2d at 819 (citing §27-1-719(2), MCA). The Court recognized that “evidence of injuries caused by similar models would be relevant to both the ‘defect’ and the ‘danger." Preston, 282 Mont. at 209, 936 P.2d at 819.
¶55 The Court further noted that in order to prevail on punitive damages, Preston would have to prove that the defendant had acted with indifference to the ‘high probability of injury to the plaintiff.” Preston, 282 Mont. at 209, 936 P.2d at 819 (citing §27-1-221(2), MCA). Evidence of injuries caused by similar models would be relevant to proving punitive damages as ‘the existence of similar injuries tends to demonstrate the manufacturer’s knowledge of the ‘high probability of injury.’” Preston, 282 Mont. at 209, 936 P.2d at 819. The Court added that ‘information of similar injuries caused by other models of nailers *341 ... would be relevant to the issues of whether the design was unreasonably dangerous, whether [the manufacturer] was aware of the danger, and whether [the manufacturer] was aware of a viable, alternative design.” Preston, 282 Mont. at 209, 936 P.2d at 819.
¶56 Evenflo insists that “courts routinely exclude evidence regarding the recall of different models, especially where the recall involved a different defect.”Evenflo again points solely to out-of-jurisdiction cases that fail to support its broad proposition. In Lewy v. Remington Arms Co., Inc., 836 F.2d 1104, 1108-09 (8th Cir. 1988), the Eighth Circuit reversed the trial court’s decision to allow the plaintiff to introduce extensive evidence concerning the Remington model 600 rifle in a product liability action that involved the Remington model 700 rifle. The court acknowledged that the model 600 evidence would have been relevant if the model 600 had been “substantially similar in design and manufacture” to the model 700 with respect to the design defect at issue. Lewy, 836 F.2d at 1109. The court emphasized numerous differences between the two models with respect to the design defect at issue, however, and determined that the plaintiffs had not met their ‘burden of showing substantial similarity.” Lewy, 836 F.2d at 1109.
¶57 The other cases cited by Evenflo emphasize the dissimilarity between product models or involve facts and procedural postures easily distinguishable from the Malcolms’ case. See Olson v. Ford Motor Co., 410 F. Supp. 2d 869 (D. N.D. 2006) (recall evidence not admissible where the recalls involved different and dissimilar models, different defects, and contrasting purposes for the recall); Jordan v. General Motors Corp., 624 F. Supp. 72 (E.D. La. 1985) (evidence of recall campaign not relevant where the recall dealt with a different model year and a “distinctly different” defect). The Malcolms, by contrast, introduced evidence that the model 206 and 207 were substantially similar with respect to the defects at issue. The evidence included the Malcolms’ expert D’Aurelio’s testimony that the OMW model 206 and 207 were ‘identical” with respect to the open belt hook design and the lack of EPS padding. Evenflo representative Kiser admitted that the seatbelt hook design was ‘(pretty close” to absolutely identical. Kiser also admitted that a risk existed that the belt hooks could fail and allow the seat to slip off the seatbelt of any OMW models, including the 207.
¶58 The District Court acted within its discretion when it determined that the model 206 and model 207 were substantially similar with respect to the design defects alleged by the Malcolms. Sunburst, ¶ 74. The substantial similarity between the two models *342 dictates that evidence regarding the model 206 would be relevant to whether Evenflo had sold the model 207 to the Malcolms in a “defective condition unreasonably dangerous to a user.” Section 27-1-719(2), MCA. Evidence of cracks, shearing of belt hooks, and FMVSS 213 test failures of the model 206 “would be relevant to both the ‘defect’ and the ‘danger.’’’ Preston, 282 Mont. at 209, 936 P.2d at 819. The District Court acted within its discretion when it decided that evidence regarding the model 206 constituted relevant evidence in determining Evenflo’s liability for compensatory damages. Sunburst, ¶ 74.
¶59 The District Court also determined that evidence of Evenflo’s actions surrounding the 1995 recall would be relevant for the purpose of the Malcolms’ punitive damages claim. Evenflo repeatedly argues that evidence of the 1995 recall of the OMW model 206 should be inadmissible as the Malcolms’ alleged defect in the model 207 “differ[s] from the problem that prompted the Model 206’s recall.” Evenflo claims that “cracking in some shells”constituted “the sole basis”for the 1995 recall of the model 206. Evenflo claims that the Malcolms Incorrectly imply that the Model 206 was recalled because of its open belt hook design. If the belt hook design had triggered the recall, NHTSA never would have allowed Evenflo to sell the Model 207.” Evenflo argues that “[t]he proof is in the pudding. Unlike the Model 206, the Model 207 complies with FMVSS 213-a fact the jury never heard.”
¶60 Evenflo’s argument disregards the Malcolms’ evidence that the model 206 contained the same defects as the model 207. See ¶ 57. Evenflo represented to NHTSA and consumers that “cracking in some shells” and a “cut and pinch” hazard constituted the sole reason for the recall of the model 206. The Malcolms presented evidence, however, that Evenflo knew from test results and test videotapes that the breaking apart of the seat in the area of the vehicle seat belt path and the resulting loss of restraint of the child seat constituted the true hazard of the model 206. Evenflo ignores the fact that this incomplete representation to NHTSA formed a major basis of the Malcolms’ punitive damages claim.
¶61 The District Court noted in its order denying Evenflo’s motion for a new trial that Evenflo had used evidence of its “cooperation and interaction with the NHTSA” in connection with its 1995 “consumer corrective action” involving the OMW model 206 to argue against liability for punitive damages. The District Court correctly observed that the Malcolms had “used this same evidence to show ... how *343 Evenflo lied to NHTSA, the public and even Jessi Malcolm about how badly the [OMW] was breaking apart, and the true ejection hazards posed to children riding in safety seats with open belt hooks.” The court further determined that ‘Evenflo’s so-called ‘fix’ incorporated into the model 207 did nothing to eliminate the ejection hazard posed by the open belt hook design.”
¶62 Evenflo claims that “[t]he Malcolm case is the only case involving an allegation that the belt hook of a Model 207 broke and caused death or serious injury to a child. It is also the only known case of a child being ejected from a vehicle while in a Model 207.” Evenflo’s claim ignores the reports that it received of OMW model 207 belt hooks breaking off, releasing from the vehicle seat belt, with the baby and seat bouncing around in the passenger compartment. See ¶¶ 14-16. Evenflo made the same assertion in its cross-examination of D’Aulerio. D’Aulerio replied that it was “a miracle”that the babies involved in the other accidents had not been injured.
¶63 Evenflo’s conduct surrounding the testing and recall of the model 206 constituted relevant evidence regarding Evenflo’s state of mind with respect to its sale of the model 207. Sunburst, ¶ 81. Evenflo’s state of mind represented a key element in determining whether Evenflo had acted with actual fraud or actual malice. Sunburst, ¶ 81; §27-1-221, MCA. The District Court acted within its discretion when it determined that evidence surrounding the recall and testing of the OMW model 206 was relevant for the purposes of determining punitive damages. Sunburst, ¶ 74.
¶64 Did the District Court abuse its discretion by applying unfairly its FMVSS213 evidentiary ruling with respect to compensatory damages?
¶65 Evenflo argues that the District Court abused its discretion by applying its FMVSS 213 rulings ‘in a one-sided manner.” Evenflo points to the court’s rulings that allowed the Malcolms to present evidence regarding the OMW’s test ‘failures,” the recall of the model 206 due to noncompliance with FMVSS 213, and the alternative ‘funnel” design’s perfect FMVSS 213 test success. Evenflo contends that fairness dictates that the court should have allowed Evenflo to inform the jury that the model 207 had “passed” FMVSS 213, “which distinguished it from its recalled predecessor Model 206.”
Test Failures
¶66 Evenflo and the Malcolms have engaged in semantic arguments throughout trial and on appeal regarding the difference between “compliance” with FMVSS 213 test standards and OMW ‘failures”that occurred during FMVSS 213 testing. The Malcolms use the word *344 “failure”in an informal sense to describe cracks, rips, tears, and other malfunctions that they argue constitute a defect and evidence of an impending failure of the shell. Evenflo equates any mention of the word ‘failure” with a “pass” or ‘fail” of the official standards of FMVSS 213.
¶67 The Malcolms raised the issue of the OMW’s test ‘failures” in their opening statement. The Malcolms referred to sled testing conducted by government agencies, Evenflo, and Consumer Reports that showed cracks on the OMW shell and a tendency for the belt hook to break under stress. The Malcolms claimed that the OMW had been tested 582 times, with 157 ‘failures.”Evenflo argued in chambers that the court should have allowed it to inform the jury that ‘the testing agency that was running this test deemed the result a pass.” The Malcolms responded that they were referring to “cracks, rips, and tears ... failures in the shell,” rather than any ‘failure” of the test standard as determined by any governmental agency.
¶68 The Malcolms’ expert D’Aulerio testified that he had reviewed 582 tests performed on Evenflo OMW child seats. D’Aulerio found 157 tests where ‘there was some kind of problem, either a fracture or a crack, or a break, in some instances a total complete fracture of the belt hook.... It worked out to be, like, twenty-seven percent of the tests.” The tests included the model 206, model 207, and prototypes of both models. D’Aulerio testified that the tests were “a big huge red flag” that indicated a defect in the OMW. Evenflo contends that “[t]he jurors who heard that testimony could only have believed that the Model 207 regularly failed in testing.”
¶69 The District Court also allowed the Malcolms to introduce into evidence as Exhibit 278-AD’Aulerio’s 11-page‘test failures”chart. See ¶ 25. The court denied Evenflo’s motion to introduce the underlying test reports pursuant to the rule of completeness. Evenflo argues that Malcolms’ opening and closing arguments “served to ensure that the jury would gather from D’Aulerio’s testimony and his ‘test failures’ chart that Evenflo’s Model 207 seats had failed in testing.”
¶70 Evenflo further points to Evenflo representative Randolph Kiser’s testimony on cross-examination. Kiser testified that Evenflo had recalled the OMW model 206 due to its failure to conform to FMVSS 213. Evenflo contends that Kiser’s testimony left the jury with the false impression that the model 207 also must have failed tests. The Malcolms also elicited testimony from Kiser that the Malcolms’ superior alternative tunnel design never had failed in testing. Evenflo argued that the court should have allowed it to introduce evidence that *345 the model 207 likewise never had failed in testing even without the tunnel design.
¶71 Counsel for the Malcolms also referred to test ‘failures” in his closing argument. For example, counsel for the Malcolms made the following statement:
Ladies and gentlemen, Exhibit 278-A, that is the list, the chronological list, of all the testing. And you can look for yourself and see the dates of the tests, and you can see the descriptions that Evenflo actually had as to the nature of these cracks. There was a lot of seats, after production started up in late July of 1995. Dozens, and dozens, and dozens of seats in which there were cracks of varying degrees and magnitude in this seat. Now, the crack, itself, doesn’t mean the child is going to get killed, but what it is is it’s notice that your margin of safety in this design is so thin that you’re getting cracks at these speeds. What’s going to happen if you are involved in a higher speed impact?
Exhibit 278-A lists the ‘test failures” compiled by D’Aurelio. Counsel for the Malcolms continued throughout their closing to press the point that Evenflo knew about the design defects from its tests. Counsel argued that ‘Evenflo knew about it. They knew about it from its tests.”
¶72 Although the District Court did not allow Evenflo to state specifically that the OMW model 207 had passed FMVSS 213, the court did allow Evenflo some latitude. Evenflo informed the jury in its opening statement that the testing that resulted in the recall involved only the model 206. Evenflo explained that it had changed the OMW before it produced the model 207. Evenflo argued that the “tests don’t tell you anything, at all, about either the Malcolm accident or the Malcolm seat. This wasn’t even the same model seat.” Evenflo went on to state that the production model 207 “was tested another 320 times by NHTSA, by the Canadian Government, by Evenflo, by independent labs, and it passed every test. Every test, it passed.” Evenflo argued that the Malcolms’ expert D’Aulerio was ‘the only person that’s going to testify that ... the Canadians, they got it wrong, NHTSA got it wrong, the independent labs got it wrong, the car seats didn’t really pass those tests.” Evenflo reiterated that “[t]here is not one testing agency that has found that the 207 did not pass the test.”
¶73 Evenflo representative Kiser testified that the OMW model 207 never was recalled, ‘tunjlike the 206.” Kiser stated that “[not] one single video” showed the model 207 breaking apart like the model 206. Kiser testified at length regarding the engineering changes that Evenflo had made to the OMW after the model 206 recall. Kiser *346 pointed out that D’Aulerio had counted “failures” in model 206 seats and prototype seats in his “test failures” chart. Riser further testified that the NHTSA had conducted 22 tests on the model 207 and had not observed any cracks or any problems with the belt hooks.
¶74 Evenflo witness William Van Arsdell, an engineer and design expert, also testified at trial. Evenflo’s counsel distinguished the OMW model 207 and the model 206 at the beginning of Van Arsdell’s testimony. Van Arsdell opined that the Malcolms’ OMW model 207 child seat was ‘hot defective in any way.” Van Arsdell testified that he had conducted rollover crash tests of the OMW model 207 and that the belt hooks had not broken or sustained any damage. Van Arsdell testified that, after reviewing “all [of] the sled tests,” he believed the model 207 to be “a different seat” than the model 206. Van Arsdell distinguished between the cracks and fractures that occurred in the model 206 during sled testing and the cracks in the Malcolms’ model 207. Van Arsdell testified that not one sled test showed damage to the belt hook of the model 207.
¶75 Van Arsdell also testified that the OMW’s open belt hook design provided advantages over the Malcolms’ alternative “tunnel” design and the same level of safety. Van Arsdell suggested that the open belt hook design was more convenient than the “tunnel” design. Van Arsdell added that the open belt hook design “promotes easy proper use,” and that If you don’t use [child seats] properly, they probably can’t do you much good.” Van Arsdell noted that he was not aware of anyone aside from the Malcolms’ expert D’Aulerio who had criticized the open belt hook design.
¶76 Evenflo repeatedly tested the boundaries of the District Court’s FMVSS 213 ruling. The District Court sustained the Malcolms’ objection after Evenflo’s counsel asked D’Aulerio ‘you’re the only one that’s been critical of those test results?”Evenflo’s counsel, undeterred, drew further objection for inquiries such as ‘you know that NHTSA has specifically tested the model 207, that’s at question here?” and ‘[y]ou can’t sell a child restraint system until NHTSA has deemed it safe and effective, right?” The Malcolms’ objection cut short a similar attempt to circumvent the court’s order in limine in Evenflo’s closing argument: “[t]his product is regulated by the United States government, by the Canadian government, it’s been tested by both governments, by the independent labs. And every lab that man mentioned, has tested this, this 207, and not one lab — ”
¶77 The record does not support Evenflo’s claim that the District Court unfairly precluded it from distinguishing the OMW model 207 *347 from the OMW model 206 and from presenting evidence that the model 207 was not defective. Evenflo attempts to bolster its case by again arguing that “[t]he disparate treatment of FMVSS evidence is most obvious if one considers the very predicate for the recall of Model 206. That predicate was the FMVSS 213 testing, which showed cracking in some shells. That’s the sole basis for the recall.” It is true that the cracking of the shells constituted the official reason for the recall. Evenflo ignores the Malcolms’ evidence that Evenflo did not inform NHTSA fully of all the defects in the OMW model 206 during the recall process.
Completeness Rule
¶78 Evenflo further argues that the District Court violated the “completeness rule” in M. R. Evid. 106, when it denied Evenflo’s request to introduce the test reports underlying D’Aulerio’s ‘test failures” chart that the court had admitted as exhibit 278-A. See ¶ 25. Evenflo contends that D’Aulerio’s chart “quoted selectively and misleadingly from FMVSS 213 test reports.” Evenflo cited to Rule 106 in its cross-examination of D’Aulerio when it offered into evidence the FMVSS 213 test reports from which D’Aulerio collected Evenflo’s quotes regarding cracks in the OMW shell. The test reports showed that many of the OMWs had complied with FMVSS 213 despite the cracks and fractures. The District Court denied Evenflo’s request on the grounds that the evidence was ‘inore prejudicial than probative ... [t]he testimony goes to the shell, and I don’t think the rest of the results are relevant to this proceeding.”
¶79 Montana’s “completeness rule” provides that when a party introduces part of a writing, an adverse party may require the introduction at that time of any other part of the writing “which ought in fairness be considered at that time.” M. R. Evid. 106(a)(1). The adverse party also "may inquire into or introduce any other part of such item of evidence” in the party’s own case. M. R. Evid. 106(a)(2). Evenflo argues that the District Court did not have discretion to deny the evidence because “a fairness test is not built into Subpart (a)(2).”
¶80 The Commission Comments to Rule 106 emphasize that the ‘trial court makes the final determination of how much evidence is needed to make a fair impression under this rule and to prevent abuses of the rule.”The Commission Comments note that the trial court’s authority arises from M. R. Evid. 403, “allowing the exclusion of relevant evidence on the grounds of prejudice,” and M. R. Evid. 611, “allowing the court the authority to conduct trial.” M. R. Evid. 106, Commission *348 Comments, MCA 2008 Annot., Vol. 5, p. 199. The Commission Comments apply to both subpart (a) and (b).
¶81 Evenflo’s Rule 106 argument merely constitutes a different strategy to introduce the prohibited evidence of the OMW model 207’s compliance with FMVSS 213. We have decided that the District Court did not abuse its discretion when it determined that even if Evenflo’s compliance with FMVSS 213’s “minimal standards”would be relevant, the evidence would be more prejudicial than probative and might tend to mislead or confuse the jury. See ¶ 44. The District Court also did not abuse its discretion when it denied Evenflo’s attempt to introduce that same evidence pursuant to Rule 106. Sunburst, ¶ 74.
Improper Legal Maneuvering
¶82 Evenflo points to Hall v. Big Sky Lumber & Supply, Inc., 261 Mont. 328, 863 P.2d 389 (1993), to support its argument that the Malcolms’ counsel committed improper legal maneuvering in his closing argument. Hall filed a tort suit against the driver of a logging truck after the logging truck struck his vehicle from behind when its brakes failed. Hall, 261 Mont. at 331, 863 P.2d at 391. A highway patrolman issued the driver a citation at the scene for ‘inadequate or defective brakes.” Hall, 261 Mont. at 336, 863 P.2d at 394. The district court granted the defendant’s motion in limine to exclude evidence of the citation. Hall, 261 Mont. at 336, 863 P.2d at 394-95. The defendant’s counsel stated during his closing argument that “if there were any defects or problems with that braking system at all, you can be sure that [one of the patrolman witnesses] would have told you about that.” Hall, 261 Mont. at 336-37, 863 P.2d at 395.
¶83 The jury found that the defendant was not negligent. Hall, 261 Mont. at 332, 863 P.2d at 392. This Court ordered a new trial. Hall, 261 Mont. at 337, 863 P.2d at 395. The Court concluded that the “argument by defense counsel to the jury [was] improper legal maneuvering. Defense counsel cannot ask to have evidence excluded and then argue that if the evidence existed it would have been admitted.” Hall, 261 Mont. at 337, 863 P.2d at 395.
¶84 Evenflo claims that the Malcolms “engaged in just such improper legal maneuvering here.” Evenflo argues that the District Court committed “transparent reversible error” when it allowed the Malcolms’ counsel to state that “if there were any inaccuracy’ in D’Aulerio’s chart, Evenflo would have said so.” Evenflo selectively parses the record. Evenflo stated in its closing argument:
[H]e tells you, please, look at Exhibit 278-A, that’s the list put together by Dr. D’Aulerio that he made from the test reports. Why *349 not put the test reports in? I mean, that’s where it came from, why not use your best evidence? I mean, think of all of this key evidence that you’re really not seeing, the door, actual test reports.
The Malcolms’ counsel then stated in rebuttal:
[Evenflo’s counsel] held it up, and it’s the exhibit prepared by Mr. D’Aulerio that has the tests, 278-A. And he said, well, where are the actual tests? Well, this is the summary. It would not have been admitted if it were not an accurate summary. And as Mr. D’Aulerio said, the words that are written, here, shell cracked on the left side starting at the belt hooks, are the words that were actually on the tests. That’s what it said. And I can assure you that if there were any inaccuracy in these 157 tests included in this summary — .
The Court overruled Evenflo’s objection. The Malcolms’ counsel continued:
I can assure you that if there were any inaccuracy about the cracks that are shown, here, that would have been pointed out. He would have been impeached on it. They would [have] said you inaccurately quoted this.
¶85 The defendant in Hall asked the court to exclude the evidence and then took advantage of the plaintiffs inability to mention the evidence by implying that the evidence did not exist. Hall, 261 Mont. at 336-37, 863 P.2d at 395. The Malcolms, on the other hand, responded to Evenflo’s implication that the actual test reports differed from those presented on the summary. The District Court’s order in limine prohibited the admission of the underlying test reports that Evenflo had mentioned in its closing argument. The Malcolms’ counsel referred to the summary of quotes that the court had deemed to be admissible. The Malcolms’ counsel did not commit improper legal maneuvering in his closing argument.
¶86 We agree that several of the District Court’s evidentiary rulings heightened the task of Evenflo’s defense. The District Court’s rulings regarding Kiser’s and D’Aulerio’s testimony and D’Aulerio’s ‘test failures” chart left Evenflo with a difficult task. The court’s exclusion of Evenflo’s FMVSS 213 compliance information made that task even more onerous.
¶87 The District Court operated within the realm of Montana’s strict liability law, however, which places a heavy burden on the manufacturer of products. See, e.g., Sternhagen, 282 Mont. at 177-78, 935 P.2d at 1144-45. Montana’s strict liability law emphasizes *350 maximum protection for the consumer and places the risk of loss on the manufacturer. Sternhagen, 282 Mont. at 175-81, 935 P.2d at 1143-46. Montana’s strict liability law rejects concepts fundamental to negligence law such as reasonableness and foreseeability. Sternhagen, 282 Mont. at 176, 935 P.2d at 1144.
¶88 We cannot say that the District Court’s rulings were improper with regard to Evenflo’s liability for compensatory damages when we view those rulings through the lens of Montana’s strict liability law. We will overturn a district court’s evidentiary rulings only if the court abused its “broad discretion.” Sunburst, ¶ 74. The record does not indicate that the court acted arbitrarily without conscientious judgment or so exceeded the bounds of reason as to work a substantial injustice. Giddings, ¶ 42. We cannot say based on this record that the court abused that discretion by applying unfairly its FMVSS 213 ruling. Giddings, ¶ 42.
¶89 Did the District Court abuse its discretion when it excluded Evenflo’s FMVSS 213 compliance evidence with respect to punitive damages?
¶90 A jury may award punitive damages when a defendant has acted with actual fraud or actual malice. Section 27-1-221, MCA. The defendant’s state of mind represents a key element in determining whether a defendant acted with actual fraud or actual malice. Sunburst, ¶ 81. Evenflo argues that the District Court’s decision to exclude evidence of the OMW model 207’s compliance with FMVSS 213 prevented it from introducing evidence bearing on its state of mind. Evenflo contends that this Court’s decision in Sunburst, which we decided after the Malcolm trial, requires reversal of the jury’s punitive damages award.
¶91 In Sunburst, Texaco operated a gasoline refinery just outside the town of Sunburst, Montana, from 1924 to 1961. Gasoline leaked from pipes at the refinery for many years and contaminated the surrounding soil. Texaco conducted a partial cleanup of the contamination in the soil and the groundwater in the late 1950s, but left a significant amount of pollution. Sunburst, ¶ 10. Montana’s Department of Environmental Quality (DEQ) eventually assumed jurisdiction over the refinery site. Sunburst, ¶ 11.
¶92 Sunburst filed suit against Texaco on February 22, 2001. Sunburst alleged numerous causes of action, including strict liability for abnormally dangerous activity. Sunburst, ¶ 19. The district court denied Texaco’s attempt to introduce evidence that it had cooperated with DEQ and that it had complied with DEQ regulations during its *351 remediation efforts in the decade before Sunburst had filed suit. Sunburst, ¶ 81. The district court determined that evidence of Texaco’s negotiations with DEQ likely would confuse the jury and divert its attention from evaluation of Sunburst’s common law claims .Sunburst, ¶ 83. The jury awarded Sunburst compensatory damages of approximately $16 million. Sunburst, ¶ 24. Thé jury also found that Texaco had acted with actual fraud or actual malice and awarded Sunburst $25 million in punitive damages. Sunburst, ¶ 26.
¶93 We concluded that the district court had abused its discretion by prohibiting Texaco from introducing evidence at trial of DEQ’s involvement in the site remediation and Texaco’s attempted compliance with government regulations. Sunburst, ¶ 85. We stated that a good faith effort to comply with all government regulations “would be evidence of conduct inconsistent with the mental state requisite for punitive damages.” Sunburst, ¶ 81.
¶94 The District Court concluded that the OMW model 207’s compliance with FMVSS 213 had “absolutely no bearing at all upon the reprehensibility of the conduct of Evenflo.”The court emphasized that Evenflo could not even begin selling the OMW without complying with FMVSS 213 and thus ‘Te]ach and every act of Evenflo relating to it[s] adherence to FMVSS 213 was intended solely to free the company up to sell, and profit from, the On My Way.”
¶95 We faced similar findings regarding the defendant’s misconduct in Sunburst. The district court noted that Texaco had been communicating with the public regarding the contamination since the late 1980’s. Sunburst, ¶ 82. The court found that Texaco’s communication with the public “consistently [had] minimized the problem and failed to accurately report their findings.” Sunburst, ¶ 82. The court attributed this effort at minimization to the fact that Texaco had been motivated by its “own financial interests.” Sunburst, ¶ 82. The court highlighted a 1989 document that outlined Texaco’s ‘hidden agenda” to save money at the expense of a meaningful cleanup in Sunburst. The court further attributed to Texaco “numerous affirmative misrepresentations concerning the pollution in Sunburst.” Sunburst, ¶ 82.
¶96 We determined that the district court’s partial reliance on these findings of misconduct by Texaco to justify an award of punitive damages could not be sustained in light of the court’s decision to exclude “evidence tending to show why the defendant acted as it did, or failed to act, whatever the case may be, when a jury considers whether to award punitive damages.” Sunburst, ¶ 84. The evidence *352 could bear on whether Texaco had acted with “deliberate indifference,” whether Texaco knowingly had concealed any material facts, and the size of any appropriate punitive award. Sunburst, ¶ 84. Sunburst retained a strong argument that Texaco’s inaction and selection of the cheap remediation alternative indeed had demonstrated “deliberate indifference,” but ‘the debate should not'be preempted by disabling Texaco from explaining itself.” Sunburst, ¶ 84.
¶97 The District Court’s order upholding the jury’s award of punitive damages to the Malcolms likewise included a number of findings of fact regarding misconduct by Evenflo. The District Court found that Evenflo had known ‘from the outset” that it could have used the safer alternative tunnel design for the OMW. The court found that the tunnel design would have provided “a substantial margin of safety” versus the open belt hook design and would have “virtually eliminate[d] the deadly risk of a loss of restraint during an accident.” The court found that Evenflo had deemed acceptable manufacturing the OMW with an unpadded, hard plastic surface, despite its knowledge that adding EPS foam padding would reduce the potentially deadly hazard of skull fractures.
¶98 The District Court further found that Evenflo had concealed from NHTSA the ‘true hazard [of] potentially deadly ejection” associated with the OMW during its June 1995 “consumer corrective action.” The court stated that Evenflo had failed to remedy sufficiently the hazard before re-starting production, and had continued to withhold its knowledge that the OMW “continued to crack, tear, or peel back in the area of the automobile seat belt path at a rate that was dangerously high.”The court noted that despite Evenflo’s knowledge of the hazards associated with the OMW, it had assured J essica Malcolm that the seat was “safe to use” with her soon to be born child.
¶99 We cannot sustain the District Court’s partial reliance on these findings of misconduct by Evenflo in light of the court’s decision to exclude evidence that might show why Evenflo “acted as it did, or failed to act, whatever the case may be, when the jury considered] whether to award punitive damages.” Sunburst, ¶ 84. Evidence of Evenflo’s good faith effort to comply with all government regulations, including FMVSS 213, “would be evidence of conduct inconsistent with the mental state requisite for punitive damages.” Sunburst, ¶ 81.
¶100 The District Court attempted to distinguish Sunburst on the grounds that compliance with “the minimal frontal impact standard” established by FMVSS 213 was ‘irrelevant” and ‘inadmissible.” We agree that evidence of the OMW model 207’s *353 compliance with FMVSS 213 was not relevant to the issue of compensatory damages. See ¶ 44. We cannot agree with the District Court that the FMVSS 213 compliance evidence would not be relevant to the issue of punitive damages. Evenflo may have been able to persuade the jury that its compliance with FMVSS 213 showed that it had not evinced “deliberate indifference” to the welfare of the occupants of the OMW. Sunburst, ¶ 84. The jury also might have decided that evidence of Evenflo’s misconduct demonstrated “deliberate indifference,” but the District Court “should not have preempted that debate by disabling [Evenflo] from explaining itself.” Sunburst, ¶ 84.
¶101 The District Court abused its discretion by prohibiting Evenflo from introducing evidence of the OMW model 207’s compliance with FMVSS 213 for the purposes of considering the appropriateness of punitive damages. Sunburst, ¶ 74. We vacate the jury’s award of $3.7 million in punitive damages. The question of punitive damages must be put again to a jury with Evenflo being allowed to present evidence of the OMW model 207’s compliance with FMVSS 213.
¶102 As we recognized in Sunburst, ¶ 86, this decision raises the problem of how the District Court could have ensured that the jury considered the OMW model 207’s compliance with FMVSS 213 for purposes of punitive damages, but disregarded the same evidence for the purposes of compensatory damages. The District Court noted that “the dilemma is a thorny one” and opined that “dilemmas such as this are unwelcome injury trials.”
¶103 We recognize the difficulties highlighted by the District Court in conducting a jury trial. We also recognize, however, that our system provides for the presentation of evidence regarding liability for compensatory damages and punitive damages to the jury in a single proceeding. See Finstad v. W.R. Grace & Co., 2000 MT 228, ¶ 20, 301 Mont. 240, 8 P.3d 778; First Sec. Bank of Glendive v. Gary, 245 Mont. 394, 401, 798 P.2d 523, 527 (1990); §27-l-221(6)-(7). We must trust that the jury will heed the court’s instructions as to how to evaluate the evidence presented. See e.g. Murray v. Talmage, 2006 MT 340, ¶ 17, 335 Mont. 155, 151 P.3d 49. We need not put our reliance to the test here. The District Court excluded evidence of the OMW model 207’s compliance with FMVSS 213 for both purposes. We affirmed the District Court’s decision for the purposes of compensatory damages. See ¶ 44. A new jury may consider evidence of the OMW model 207’s compliance with FMVSS 213 for the purposes of determining whether *354 Evenflo acted with actual fraud or actual malice. Section 27-1-221, MCA.
¶104 We affirm in part, reverse in part, and remand for further proceedings.
CHIEF JUSTICE McGRATH, JUSTICES LEAPHART and WARNER concur.